UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

| | |
|---|---|
| JESSE KENT, Individually and on Behalf of All Others Similarly Situated, and Derivatively on Behalf of ROADRUNNER TRANSPORTATION SYSTEMS, INC., | Case No. |
| Plaintiff, | CLASS AND DERIVATIVE ACTION |
| v. | |
| CURTIS W. STOELTING, JUDITH A. VIJUMS, SCOTT D. RUED, MARK A. DIBLASI, JAMES D. STALEY, CHRISTOPHER L. DOERR, JOHN G. KENNEDY, III, BRIAN C. MURRAY, WILLIAM S. URKIEL, MICHAEL P. WARD, PETER R. ARMBRUSTER, BRIAN J. VAN HELDEN, IVOR J. EVANS, CHAD M. UTRUP, SCOTT L. DOBAK, and RALPH W. KITTLE III, | |
| Defendants, | |
| -and- | |
| ROADRUNNER TRANSPORTATION SYSTEMS, INC., a Delaware corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER CLASS ACTION AND DERIVATIVE COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Class and Derivative Complaint for declaratory relief, violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder class and derivative action brought by plaintiff individually and on behalf of holders of the common stock of Roadrunner Transportation Systems, Inc. ("Roadrunner" or the "Company") and derivatively on behalf of Roadrunner against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to Roadrunner's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2. Roadrunner is a logistics provider, offering transportation for delivery of products and supply chain services to its customers. More specifically, the Company operates an asset-light transportation[1] and logistics service with a suite of global supply chain solutions including truckload logistics ("TL"), customized and expedited less-than-truckload ("LTL"), intermodal

---

[1] Asset-light transportation refers to Roadrunner's use of third-party trucks and drivers to provide services to its customers at lower costs. By decentralizing the use of assets, the asset-light provider generally reduces the capital expenditures otherwise needed to maintain a company-owned transportation fleet.

solutions, freight consolidation, inventory management, expedited services, air freight, international freight forwarding, customs brokerage, and transportation management solutions ("TMS"). In sum, the Company provides various transportation and logistics services to get its customers' products to the desired market. Roadrunner utilizes a third-party network of transportation providers, comprised of independent contractors and purchased power providers, with a focus on mid-size shippers. Roadrunner has several subsidiaries, including Morgan Southern, Inc. ("Morgan Southern"), which provides over-the-road ("OTR") trucking services, and M. Bruenger & Co., Inc. ("Bruenger"), which provides refrigerated and dry van carrier services.

3.      Roadrunner's initial Registration Statement on Form S-1 filed with the SEC on July 24, 2008, prior to the Company's initial public offering ("IPO"), stated that the Company's "principal strategy has been to develop a full-service transportation and logistics provider under a non-asset based structure through the integration and internal growth of complementary businesses." As part of this strategy, Roadrunner purchased Morgan Southern for $20 million and Bruenger for over $10 million in 2011, among several other companies. The Company currently has twenty-five operating businesses under its control.

4.      HCI Equity Partners ("HCI") is a private equity firm that invests in growth-oriented service companies like Roadrunner. HCI has owned an interest in Roadrunner since the Company's formation, and as of March 1, 2016, HCI and its affiliates hold approximately 25% of Roadrunner's outstanding common stock. Additionally, HCI has maintained a presence on the Roadrunner Board of Directors (the "Board") through defendants Ivor J. Evans ("Evans"), Scott D. Rued ("Rued"), and Judith A. Vijums ("Vijums").

5.      Beginning in 2010, Roadrunner entered into a series of advisory agreements with HCI, wherein HCI provided oversight of Roadrunner's various acquisitions and the corresponding debt financing in return for fees and other remuneration. In total, Roadrunner has paid HCI over $3.5 million in advisory fees and remuneration from 2010 to 2015.

6.      From 2013 to 2016, Roadrunner acquired several companies. The Company had to expand its credit facility with its lenders in order to finance this acquisition strategy. While this acquisition-leaning strategy resulted in a heavy debt load and diminished cash flows, it seemed to be paying off with Roadrunner's revenues increasing from $632 million in 2010 to nearly $2 billion by 2015. These results, however, were all smoke and mirrors.

7.      On November 10, 2016, Roadrunner filed a Notification on Late Filing of Form 12b-25 with the SEC, notifying the SEC that its quarterly report for the third fiscal quarter of 2016 would not be filed within the prescribed time period without unreasonable effort or expense. Pointing to on-going accounting issues, the Company identified a mistake in the calculation of its cash flow leverage ratio associated with its covenants with lenders for four fiscal quarters ending September 30, 2016. Thus, the Company would not be within its financial covenant for the four fiscal quarters ending on September 30, 2016, without a waiver for non-compliance by the Company's lenders.

8.      After obtaining this waiver, on November 14, 2016, the Company timely filed its Quarterly Report on Form 10-Q for the third fiscal quarter of 2016 with the SEC. The Individual Defendants (as defined herein) continued to boast that the Company's internal controls over its financial reporting were effective as of September 30, 2016.

9.      On January 30, 2017, however, in a press release, Roadrunner announced that the Company was restating its historical financial statements. The restatement encompassed all of

the quarterly Forms 10-Q and annual Forms 10-K filed by the Company for the fiscal quarters ended March 31, 2014 through September 30, 2016 and fiscal years ended December 31, 2014 and 2015. The Company had stated that those financial statements could no longer be relied upon. Similarly, all related press releases, investor presentations, or other public announcements describing Roadrunner's financial statements for these periods, along with the associated report of Roadrunner's accountants at Deloitte & Touche, LLP could no longer be relied upon.

10.     In explaining the delay, the Company revealed there were accounting discrepancies at its Morgan Southern and Bruenger subsidiaries. Specifically, Roadrunner acknowledged that errors had been made in the accounting of "unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and linehaul and other driver payables." The Company also admitted that the investigation could reveal that there were accounting errors within periods prior to those mentioned. The Company estimated that it would require prior period adjustments to Roadrunner's results of operations of between $20 million and $25 million.

11.     As a result of these accounting errors, Roadrunner was compelled to amend its previously filed annual Forms 10-K for the years ended December 31, 2014 and 2015, and its quarterly Forms 10-Q for the fiscal quarters ended March 31, 2014 through September 30, 2016.

12.     Moreover, Roadrunner revealed in the January 30, 2017 Current Report on Form 8-K filed with the SEC that the Company would record a non-cash goodwill impairment charge in the range of $175 million to $200 million. These goodwill impairments were also associated with Roadrunner's acquisition of Morgan Southern and Bruenger. This goodwill impairment charge further demonstrates the damage done to the Company's reputation due to its reckless growth-through-acquisition strategy, as well as its lack of effective internal accounting controls

and disclosure procedures. In the wake of these adjustments, analysts at Stifel Financial stated that there was now a "strong negative bias" on the shares, as the future of the Company was "likely selling off pieces to pay back its lenders."

13.     In the wake of the January 30, 2017 disclosure, Roadrunner's stock plunged more than 31%, or $3.62 per share on January 31, 2017, to close at $7.92 per share compared to the previous trading day's closing of $11.54, erasing almost $138.8 million in market capitalization, or approximately 31% of the stock's value.

14.     In a conference call held on January 31, 2017 for investors and analysts, defendant Curtis W. Stoelting ("Stoelting"), the Company's Chief Executive Officer ("CEO"), admitted that "high levels of growth had put some stress and stretched the organization structure that was in place." Defendant Stoelting further acknowledged that the Company would have benefited from "more oversight from a corporate point of view."

15.     As a direct result of this unlawful course of conduct, Roadrunner is now the subject of numerous federal securities class action lawsuits filed in the U.S. District Court for the Eastern District of Wisconsin on behalf of investors who purchased Roadrunner's shares alleging violations of the federal securities laws and to pursue remedies under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

16.     Further, the Company has not held an Annual Meeting of Stockholders since May 18, 2016, more than thirteen months ago. The Company has also not filed a 2017 Proxy Statement, despite having appointed two new directors to the Board on June 6, 2017, defendants Scott L. Dobak ("Dobak") and Ralph W. Kittle III ("Kittle"), increasing the Board size to twelve members without stockholder elections. Defendants' failure to hold such a meeting is in violation of title 8, section 211 of the Delaware General Corporation Law Code ("Section 211")

stockholder meeting), the Board approved and appointed defendant Dobak to the Board. Defendant Dobak is the current CEO of Dicom Transportation Group ("Dicom"), and has been since February 2014. Dicom is a competitor of Roadrunner, providing business-to-business expedited transportation services, including offering courier, LTL, and truckload delivery services, as well as third-party logistics and TMS. Upon information and belief, Roadrunner and Dicom's competitive annual sales exceed the statutory threshold.

19.   Plaintiff now brings this action on behalf of the Company to hold the Individual Defendants accountable for their wrongdoing, force the annual stockholder meeting, remove defendant Dobak from the Board to regain compliance with the Clayton Act, and rectify the harm to the Company for which the defendants are responsible.

## JURISDICTION AND VENUE

20.   Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, as well as violations of Section 8 of the Clayton Act, 15 U.S.C. §19. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

21.   This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

---

further defined as "gross revenues for all products and services sold by one corporation over that corporation's last completed fiscal year." *Id.*

22. Venue is proper under 28 U.S.C. §1391(a) because Roadrunner maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

23. Plaintiff Jesse Kent was a stockholder of Roadrunner at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Roadrunner stockholder.

**Nominal Defendant**

24. Nominal defendant Roadrunner is a Delaware corporation with principal executive offices located at 4900 South Pennsylvania Avenue, Cudahy, Wisconsin. Roadrunner works with independent contractors and third-party carriers to provide domestic, international air, and ocean transportation services to customers. Roadrunner's goal is to reduce operating costs for customers, improve supply chain efficiency, redirect resources to core competencies, and enhance customer service. As of December 31, 2015, Roadrunner has employed 4,502 personnel and operates more than 100 properties throughout the United States and Canada.

**Defendants**

25. Defendant Stoelting is Roadrunner's CEO and has been since April 2017, and a director and has been since January 2016. Defendant Stoelting was also Roadrunner's President and Chief Operations Officer from January 2016 to April 2017. Defendant Stoelting knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate

internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

26.     Defendant Vijums is Roadrunner's Vice President and has been since March 2007 and a director and has been since March 2005. Defendant Vijums is a Managing Director at HCI and has been since 2003. Defendant Vijums knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

27.     Defendant Rued is Roadrunner's Chairman of the Board and has been since March 2010, and a director and has been since March 2005. Defendant Rued was the Company's Chairman of the Board from March 2005 to July 2008. Defendant Rued is also the Co-Founder of HCI and a Managing Partner at the firm and has been since 2003. Defendant Rued knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

28.     Defendant DiBlasi is Roadrunner's Interim Vice Chairman of the Board and an executive officer and has been since April 2017 and a director and has been since July 2006. Defendant DiBlasi was also Roadrunner's CEO from January 2006 to April 2017 and President from January 2006 to January 2016. Defendant DiBlasi is named as a defendant in the related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant DiBlasi knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures

with respect to Roadrunner's accounting practices and operations. Roadrunner paid defendant DiBlasi the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $543,885 | $661,534 | - | $8,754 | $1,214,173 |
| 2014 | $498,846 | $370,718 | $163,368 | $4,384 | $1,037,316 |
| 2013 | $457,308 | $424,402 | $98,580 | $8,424 | $988,714 |

29.     Defendant James D. Staley ("Staley") is Roadrunner's Lead Director and has been since December 2016 and a director and has been since October 2010.   Defendant Staley knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Roadrunner paid defendant Staley the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $38,000 | $60,649 | $98,649 |
| 2014 | $38,000 | $46,345 | $84,345 |
| 2013 | $38,000 | $56,592 | $94,592 |

30.     Defendant Christopher L. Doerr ("Doerr") is a Roadrunner director and has been since October 2010.   Defendant Doerr knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Roadrunner paid defendant Doerr the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $35,000 | $60,649 | $95,649 |
| 2014 | $35,000 | $46,345 | $81,345 |
| 2013 | $35,000 | $56,592 | $91,592 |

31.     Defendant Kennedy is a Roadrunner director and has been since December 2012. Defendant Kennedy was a member of Roadrunner's Audit Committee from at least April 2013 to at least April 2016.   Defendant Kennedy knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.   Roadrunner paid defendant Kennedy the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $35,000 | $60,649 | $95,649 |
| 2014 | $35,000 | $46,345 | $81,345 |
| 2013 | $35,000 | $56,592 | $91,592 |

32.     Defendant Brian C. Murray ("Murray") is a Roadrunner director and has been since August 2015.   Defendant Murray was Chairman of Roadrunner's Audit Committee from August 2015 to at least April 2016.   Defendant Murray knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

33.     Defendant Urkiel is a Roadrunner director and has been since May 2010. Defendant Urkiel was a member of Roadrunner's Audit Committee from at least April 2013 to at least April 2016.   Defendant Urkiel knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.   Roadrunner paid defendant Urkiel the following compensation as a director:

- 11 -

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2015 | $40,000 | $60,649 | $100,649 |
| 2014 | $40,000 | $46,345 | $86,345 |
| 2013 | $40,000 | $56,592 | $96,592 |

34.     Defendant Michael P. Ward ("Ward") is a Roadrunner director and has been since February 2016.  Defendant Ward knowingly and recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

35.     Defendant Peter R. Armbruster ("Armbruster") was Roadrunner's Chief Financial Officer ("CFO"), Treasurer, and Secretary from December 2005 to March 2017.  Defendant Armbruster was also Roadrunner's Vice President of Finance from December 2005 to January 2015.  Defendant Armbruster is named as a defendant in the related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Armbruster knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Roadrunner paid defendant Armbruster the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|------|------|------|------|------|
| 2015 | $335,192 | $441,040 | - | $8,754 | $784,986 |
| 2014 | $306,154 | $231,704 | $82,600 | $4,370 | $624,828 |
| 2013 | $281,154 | $248,975 | $45,743 | $8,064 | $583,936 |

36.     Defendant Brian J. van Helden ("van Helden") was Roadrunner's Chief Operations Officer from December 2013 to June 2015.  Defendant van Helden knowingly,

recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Roadrunner paid defendant van Helden the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2014 | $371,923 | $278,027 | $102,583 | $3,880 | $756,413 |
| 2013 | $296,154 | $248,975 | $55,815 | $7,916 | $608,860 |

37. Defendant Evans was a Roadrunner director from March 2005 to April 2014. Defendant Evans was Roadrunner's Chairman of the Board from July 2008 to March 2010. Defendant Evans was also an Operating Partner at HCI from March 2005 to 2015. Defendant Evans knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

38. Defendant Utrup was a Roadrunner director from May 2010 to September 2015. Defendant Utrup was the Chairman of Roadrunner's Audit Committee from at least April 2013 to August 2015 and a member from August 2015 to September 2015. Defendant Utrup knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Roadrunner paid defendant Utrup the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $33,750 | $60,649 | $94,399 |
| 2014 | $42,500 | $46,345 | $88,845 |
| 2013 | $42,500 | $56,592 | $99,092 |

39.     Defendant Dobak is a Roadrunner director and has been since May 2017. Defendant Dobak is the CEO of Dicom, a corporation in competition with Roadrunner. Defendant Dobak's interlocking directorate violates Section 8.

40.     Defendant Kittle is a Roadrunner director and has been since May 2017.

41.     The defendants identified in ¶¶25-26, 28, 35-36 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶25-34, 37-40 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶31-33, 38 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶25-40 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

42.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Roadrunner and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Roadrunner in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Roadrunner and not in furtherance of their personal interest or benefit.

43.     To discharge their duties, the officers and directors of Roadrunner were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Roadrunner were required to, among other things:

           (a)     properly and accurately guide the Company's stockholders and the public when speaking about Roadrunner's financial condition at any given time, including making

accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Roadrunner conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(d)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(e)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refrain from engaging in deceptive or fraudulent conduct.

**Breaches of Duties**

44.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Roadrunner, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

45.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in violations of law, in making improper statements to the public and Roadrunner's stockholders, improper practices that wasted the Company's assets, and caused Roadrunner to incur substantial damage.

46.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Roadrunner, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Roadrunner has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

47.     In addition to these duties, under the Audit Committee Charter, the Audit Committee Defendants, defendants Kennedy, Murray, Urkiel, and Utrup, owed specific duties to Roadrunner to assist the Board in overseeing "the accounting and financial reporting processes of the Company and audits of the financial statements of the Company." Moreover the Audit Committee's Charter provides that its members must assist the Board with respect to its oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications and independence of the Company's independent auditor, and the performance of the Company's internal audit function and independent auditor. Furthermore, the Audit Committee is required to "obtain and discuss with management ... major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to Roadrunner's internal controls and disclosure procedures, as well as the operation of the Company's growth-through-acquisition strategy, that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Roadrunner, regarding the Individual Defendants' management of Roadrunner's operations and the adequacy of its internal controls and disclosure procedures; and (iii) enhance the Individual Defendants' executive and directorial positions at Roadrunner and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

50.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

51.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust

enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## ROADRUNNER SPENDS HUNDREDS OF MILLIONS OF DOLLARS ACQUIRING COMPANIES TO ENHANCE ITS FINANCIAL REPORTING

54.     Roadrunner is an asset-light transportation and logistics services provider that offers a suite of global supply chain solutions, including TL, customized and expedited LTL, intermodal solutions, freight consolidation, inventory management, expedited services, air freight, international freight forwarding, customs brokerage, and TMS. To provide these services, the Company purchases existing providers with pre-existing transportation equipment and facilities in the small- to mid-size range, claiming that its business model makes the Company highly scalable and flexible.

55.     According to Roadrunner's initial Registration Statement, filed ahead of the Company's IPO, the Company would be pursuing a growth-through-acquisition strategy, stating

that it would continue to "develop a full-service transportation and logistics provider under a non-asset based structure through the integration and internal growth of complementary businesses."

56.     Since Roadrunner's formation in June 2005, HCI has been the Company's largest stockholder, currently owning 24.9% of the Company's outstanding common stock. During the relevant period from 2013 to 2016, various HCI affiliates maintained three seats on Roadrunner's Board, including defendants Evans, Rued, and Vijums. Under the supervision of the Individual Defendants, Roadrunner engaged HCI in several consulting and advisory agreements to assist the Company in its growth-through-acquisition strategy. During the course of this arrangement, the Company paid HCI $3.5 million in fees and other remuneration.

57.     During the relevant period from 2013 to 2016, Roadrunner actively pursued this strategy by acquiring several companies, assisted by HCI and its affiliates. The Company recklessly expanded its credit facility with its lenders in order to finance the Company's purchases. As part of this strategy, Roadrunner purchased Morgan Southern for $20 million and Bruenger for over $10 million in 2011, among several other companies. The Company now has twenty-five operating businesses under the Roadrunner banner.

58.     While this acquisition-leaning strategy resulted in a heavy debt load and diminished cash flows, Roadrunner outwardly reported revenues increasing from $632 million in 2010 to nearly $2 billion by 2015. But these financial results would prove to be a fabrication.

59.     From at least 2013 through 2016, the Company engaged in a corporate growth strategy, acquiring several additional transportation providers for hundreds of millions of dollars altogether, to artificially enhance the Company's revenues, while downplaying the Company's expenses, through accounting manipulations. This reckless corporate strategy ultimately

contributed to the Company's failure in its internal accounting controls and controls over its financial reporting.

60. By January 30, 2017, the Company was forced to announce several accounting errors, rendering previous financial claims filed with the SEC from May 2014 until November 2016 unreliable.

## IMPROPER STATEMENTS REGARDING ROADRUNNER'S FINANCIAL PERFORMANCE AND INTERNAL CONTROLS

61. Defendants' improper statements regarding its financial performance began on May 1, 2013, when Roadrunner issued a press release announcing the Company's financial results for the first fiscal quarter ended March 31, 2013. In the press release, defendant DiBlasi touted the Company's "record revenues and operating income" stating:

> *We achieved record revenues and operating income in the first quarter of 2013.* These records were achieved in the lowest seasonal quarter of the year and in a quarter with fewer business days than normal. *Strong performance across all of our business segments generated first quarter revenue growth of 26.5% and net revenue growth of 33.8%. Due to sales and operational initiatives, our operating income growth of 30.7% outpaced revenue.* Our operating ratio improved 20 basis points to 93.6%, compared to 93.8% in the first quarter of 2012, despite additional costs incurred for service initiatives implemented in our LTL segment due to adverse weather conditions. Additional costs incurred in our LTL segment for the weather-related service initiatives negatively impacted our first quarter diluted earnings per share by approximately $0.02.
>
> Our LTL operating ratio improved sequentially to 93.2% in the first quarter of 2013 from 94.9% in the fourth quarter of 2012. Our continued initiatives to expand into new geographic regions, build density, improve pricing, and enhance productivity, as well as the addition of Expedited Freight Systems (EFS) in August 2012, resulted in a net revenue margin improvement from 25.8% in the first quarter of 2012 to 28.5% in the first quarter of 2013. We are pleased with the first quarter operating ratio, despite experiencing load inefficiencies due to the inclement weather.
>
> Our continued performance initiatives led to our TL operating ratio improving to 93.4% in the first quarter of 2013 from 94.2% in the first quarter of 2012. TL revenues grew by $48.5 million, or 49.5%, from the prior year quarter. Incremental revenues from our 2012 acquisitions accounted for $42.4 million of the increase, with the remaining $6.1 million representing organic growth of

6.2%. The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 70.8% increase in our TL operating income quarter-over-quarter.

*TMS revenue grew $0.8 million, or 3.7%, in the first quarter of 2013 from the prior year quarter. Organic growth, pricing, and our late February 2012 acquisition of Capital Transportation Logistics accounted for the 3.7% increase.* The operating leverage associated with this growth led to a 5.0% increase in TMS operating income quarter-over-quarter. Our TMS operating ratio improved to 89.2% compared to 89.3% in the first quarter of 2012.

62.     On May 10, 2013, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2013 with the SEC. Repeating the financial statements in the press release, the Individual Defendants, in the section entitled "Controls and Procedures," asserted that its disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained certifications by defendants DiBlasi and Armbruster pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

63.     On July 25, 2013, Roadrunner announced in a press release that it had acquired all of the outstanding membership interests of Marisol International LLC ("Marisol"), a supply chain provider of international logistics solutions based in Springfield, Missouri. Roadrunner purchased Marisol for a $66 million, plus an earn-out capped at $2.5 million. Referring to the Company's on-going growth-through-acquisition strategy, defendant DiBlasi, President and CEO of Roadrunner, stated: "As we have indicated, one of our key strategic objectives in 2013 is broadening our international capabilities to meet our customers' total transportation and logistics needs."

64.     On July 31, 2013, in a press release, Roadrunner announced its financial results for the second quarter ended June 30, 2013. The press release boasted a strong performance across all business segments, with revenue growth of 26.4% and net revenue growth of 35.6%. Due to alleged sales and operational initiatives, the Company asserted operating income growth of 31.4%, which outpaced revenue. The Company also claimed an operating ratio at 92.6%, improving thirty basis points, compared to 92.9% in the second fiscal quarter of 2012. The press release, noting the alleged positive impact of the Company's acquisitions, stated:

> Our LTL operating ratio remained the same quarter-over-quarter and improved sequentially to 91.9% in the second quarter of 2013 from 93.2% in the first quarter of 2013. Our continued initiatives to expand into new geographic regions, build density, improve pricing, and enhance productivity, as well as the addition of Expedited Freight Systems (EFS) in August 2012, resulted in a net revenue margin improvement from 25.8% in the second quarter of 2012 to 28.8% in the second quarter of 2013.

> Our continued performance initiatives led to our TL operating ratio improving to 93.0% in the second quarter of 2013 from 93.9% in the second quarter of 2012. TL revenues grew by $50.2 million, or 45.2%, from the prior year quarter. Incremental revenues from our 2012 and 2013 acquisitions accounted for $43.3 million of the increase, with the remaining $6.9 million representing organic growth of 6.2% from our existing business. *The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 66.2% increase in our TL operating income quarter-over-quarter.*

> *TMS revenue grew $3.8 million, or 16.6%, in the second quarter of 2013 from the prior year quarter, primarily due to our 2013 acquisition of Adrian Carriers.* This growth, along with a $0.7 million contingent purchase price adjustment, led to a 43.4% increase in TMS operating income quarter-over-quarter.

65.     On August 9, 2013, the Company filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2013 with the SEC. Repeating the financial statements in the press release, the Individual Defendants, in the section entitled "Controls and Procedures," asserted that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of

the Company's internal controls over its financial reporting. The public filings contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

66.    On August 15, 2013, Roadrunner announced in a news release that it had acquired certain assets from the Southeast drayage division of Transport Corporation of America, Inc. ("TA Drayage"), a provider of intermodal transportation and related services in the Southeast United States, for approximately $1.2 million, which was financed with Roadrunner's cash on hand. The news release added that during calendar year 2012, TA Drayage generated approximately $20 million in revenues, and that TA Drayage was expected to increase Roadrunner's earnings in 2013 through the acquisition.

67.    On September 18, 2013, Roadrunner announced in a press release that it had acquired substantially all of the assets of YES Trans, Inc. ("YES"), a refrigerated truckload service provider based in Salisbury, Massachusetts, for approximately $1.2 million, net of cash acquired, plus an earn-out capped at $1.1 million, financed with Roadrunner's cash on hand. The press release stated that during calendar year 2012, YES generated approximately $5 million in revenues, and that YES was expected to increase Roadrunner's earnings in the near term.

68.    On October 30, 2013, Roadrunner announced its financial results for the third quarter ended September 30, 2013 in a press release. The Company reported revenue growth, with operating income growth outpacing its revenue growth, attributed to the Company's acquisitions. The press release stated:

> *The combination of strong organic and acquisition-related revenue growth led to a 30.1% increase in third quarter revenues and a 32.3% increase in net revenues over the third quarter of 2012. For the 2013 third quarter, our operating income growth of 31.4% continued to outpace our revenue growth.*

Case 2:17-cv-00893-LA    Filed 06/28/17    Page 23 of 71    Document 1

Our operating ratio improved 10 basis points to 93.5% from 93.6% in the third quarter of 2012.

*LTL revenues grew by $11.7 million, or 8.9%, from the prior year third quarter. Incremental revenues from our 2012 acquisition accounted for $3.1 million of the increase, with the remaining $8.6 million representing organic growth of 6.5%.* Our organic growth during this year's third quarter was impacted by sluggish economic conditions in which many customers experienced a decline in shipments compared to last year's quarter. Our LTL operating ratio remained the same quarter-over-quarter at 92.4%. During the quarter, our LTL segment experienced $1.8 million of additional sequential costs related to an abnormal increase of insurance costs, temporary costs incurred to assist our recently opened service centers, and increased employee costs due to one more payroll day. The $1.8 million of increased costs were partially offset by a $1.7 million contingent purchase price adjustment. *The addition of Expedited Freight Systems (EFS) in August 2012 and the implementation of certain performance initiatives resulted in a net revenue margin improvement from 27.7% in the third quarter of 2012 to 28.5% in the third quarter of 2013.*

TL revenues grew by $45.9 million, or 36.9%, from the prior year third quarter. *Incremental revenues from our 2012 and 2013 acquisitions accounted for $32.3 million of the increase, with the remaining $13.6 million representing organic growth of 11.0% from our existing business.* Our TL operating ratio improved to 93.6% in the third quarter of 2013 from 94.1% in the third quarter of 2012. TL revenues and operating costs in this year's third quarter were also negatively affected by sluggish economic conditions, increased costs associated with hours of service rules and a flat pricing environment. During the quarter, our TL segment also experienced $1.3 million of additional sequential costs related to an abnormal increase in insurance costs, lost productivity in drayage and warehousing due to port strikes and customer order system changes, and increased employee costs due to one more payroll day. Offsetting these increased costs was a $1.6 million contingent purchase price adjustment related to two acquisitions, whose revised forecasted performance yields lower future earn-out payments. *The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 48.1% increase in our TL operating income quarter-over-quarter.*

*TMS revenue grew $27.0 million, or 112.6%, in the third quarter of 2013 from the prior year quarter, primarily due to our 2013 acquisitions of Adrian Carriers and Marisol International. This growth led to a 68.8% increase in TMS operating income quarter-over-quarter.*

69.    On November 8, 2013, the Company filed its Quarterly Report on Form 10-Q for the third fiscal quarter ended September 30, 2013 with the SEC. Repeating the financial statements in the press release, the Individual Defendants, in the section entitled "Controls and

Procedures," asserted that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

70. In a February 5, 2014 press release, Roadrunner reported financial results for the fourth quarter and fiscal year ended December 31, 2013. The Company attributed its increased growth to its acquisition strategy. The press release stated:

> Although *strong organic and acquisition-related revenue growth led to a 24.4% increase in 2013 fourth quarter revenues and a 21.6% increase in 2013 fourth quarter net revenues over the fourth quarter of 2012,* our lower than expected diluted income per share in the fourth quarter of 2013 resulted primarily from the following major factors that affected all of our segments.
>
> * * *
>
> Final valuations of definite-lived intangible assets related to our 2013 acquisitions of Marisol International and Adrian Carriers increased amortization expense by approximately $0.5 million, which negatively impacted our 2013 fourth quarter diluted income per share by $0.01.
>
> * * *
>
> During the fourth quarter of 2013, the above noted factors were partially offset by net contingent earnout adjustments of $2.6 million related to prior acquisitions and a reduction in our effective tax rate from 38.8% for the fourth quarter of 2012 to 29.2% for the fourth quarter 2013 due to a permanent tax benefit related to contingent earnout adjustments.
>
> *LTL revenues grew by $5.7 million, or 4.4%, during the fourth quarter of 2013 from the prior year fourth quarter. Our LTL revenue growth over the prior year quarter was almost entirely attributable to our recently opened terminals.*
>
> * * *

*TL revenues grew by $36.7 million, or 25.6%, during the fourth quarter of 2013 from the prior year fourth quarter. Incremental revenues from our 2013 acquisitions accounted for $23.1 million of the increase, with the remaining $13.7 million representing 9.5% organic growth.*

\* \* \*

*However, the positive impact of our recent TL acquisitions and organic revenue growth led to a 12.3% increase in TL operating income quarter-over-quarter.*

*TMS revenue grew by $30.9 million, or 130.0% during the fourth quarter of 2013 from the prior year fourth quarter, primarily as a result of our 2013 TMS acquisitions of Adrian Carriers and Marisol International.* This growth led to a 35.9% increase in TMS operating income quarter-over-quarter. Final valuations of definite-lived intangible assets related to our acquisitions of Marisol International and Adrian Carriers resulted in increased amortization expense of approximately $0.5 million sequentially from the third quarter 2013 to the fourth quarter 2013.

*Our consolidated revenue increased 26.8% to $1,361.4 million in fiscal 2013 from $1,073.4 million in fiscal 2012. This revenue growth was a combination of both organic- and acquisition related growth.* Our consolidated operating income increased 23.8% to $85.4 million in fiscal 2013 from $69.0 million in fiscal 2012. Our consolidated net income available to common stockholders increased 30.6% to $49.0 million in fiscal 2013 from $37.5 million in fiscal 2012. Our diluted income per share available to common stockholders increased 11.2% to $1.29 in fiscal 2013 from $1.16 in fiscal 2012. Our December 2012 and August 2013 stock offerings increased the weighted average diluted shares outstanding for the year ended December 31, 2013 by 4.3 million shares and impacted diluted income per share by $0.16 from the prior year.

71.     On February 24, 2014, in a press release, Roadrunner announced the acquisition of Rich Logistics, a provider of truckload and expedited services based in Little Rock, Arkansas. Additionally, Roadrunner announced the acquisition of Everett Transportation Inc. and certain assets of Keith Everett (hereinafter "Everett"). Everett is a contractor operating exclusively for Rich Logistics. The total enterprise value of the transaction was approximately $48 million. The acquisition was financed with borrowings under Roadrunner's credit facility. According to the press release, Rich Logistics generated revenues of approximately $113 million in 2013 and that Rich Logistics was expected to increase Roadrunner's earnings in 2014.

72. On March 13, 2014, the Company filed its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2013 with the SEC. The Form 10-K repeated the financial statements in the previous press release. Moreover, in the section entitled "Controls and Procedures – Management's Report on Internal Control Over Financial Reporting," the Individual Defendants declared that management is "responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." The Individual Defendants, despite this responsibility, claimed no change in the Company's internal controls over financial reporting. Defendants DiBlasi, Armbruster, Rued, Doerr, Evans, Kennedy, Staley, Urkiel, Utrup, and Vijums signed the Form 10-K including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

73. On March 14, 2014, Roadrunner announced in a press release that it had acquired all of the outstanding stock of Unitrans International Corporation ("Unitrans"), an international logistics solutions provider based in Los Angeles, California, for a total purchase price of $55.5 million, financed by borrowings under Roadrunner's credit facility. The press release stated that Unitrans generated revenues of approximately $84 million in 2013, and that Unitrans was expected to increase Roadrunner's earnings in 2014.

74. On May 8, 2014, Roadrunner filed its Quarterly Report on Form 10-Q announcing the Company's financial and operating results for the first quarter ended March 31, 2014 with the

SEC. For the quarter, the Individual Defendants claimed that the Company had net income of $10.4 million, or $0.27 per diluted share, on revenue of $382 million, compared to net income of $10.6 million, or $0.29 per diluted share, on revenue of $299.3 million for the same period in the prior year. The Individual Defendants also reported a $22.7 million decrease in accounts receivable, and a $2.2 million decrease in accounts payable. Furthermore, in the section entitled "Controls and Procedures," the Individual Defendants asserted that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendant DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

75. On July 9, 2014, Roadrunner announced in a press release that it had expanded the Company's existing credit facility to $550 million from $368 million through 2019. Roadrunner's CEO, defendant DiBlasi, alleged that "[t]he amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions."

76. On July 21, 2014, Roadrunner announced in a press release the Company's acquisition of Integrated Services, ISI Logistics, and ISI Logistics South (hereinafter "Integrated Services"), a regional logistics provider focused on the warehousing and transportation needs of customers based in Kokomo, Indiana. The total purchase price was $13 million, and was financed with borrowings under Roadrunner's credit facility. The press release further stated that

Integrated Services generated revenues of approximately $21 million in 2013 and that Integrated Services was expected to increase Roadrunner's earnings in 2014.

77. On August 7, 2014, Roadrunner filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2014 with the SEC. Without revealing on-going issues with the Company's internal controls over its financial reporting, the Individual Defendants alleged that net income was $14.8 million, or $0.38 per diluted share, on revenue of $460.2 million, compared to net income of approximately $14 million, or $0.37 per diluted share, on revenue of $331.9 million for the same period in the prior year. The Individual Defendants also reported a $36.8 million decrease in accounts receivable, and an $885,000 increase in accounts payable. The Individual Defendants, in the section entitled "Controls and Procedures," repeated the assertion that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

78. On November 6, 2014, Roadrunner filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2014 with the SEC. For the quarter, the Individual Defendants averred that net income was $14.4 million, or $0.37 per diluted share, on revenue of $498.1 million, compared to net income of $13.2 million, or $0.35 per diluted share, on revenue of $363.2 million for the same period in the prior year. The Individual Defendants also reported a $55.3 million decrease in accounts receivable, and a $19.3 million increase in accounts

payable. Without mentioning possible on-going accounting issues, in the section entitled "Controls and Procedures," the Individual Defendants repeated the assertion that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

79. On March 2, 2015, Roadrunner filed its Annual Report on Form 10-K announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2014 with the SEC. For the quarter, the Individual Defendants reported net income of $12.3 million, or $0.32 per diluted share, on revenue of $532.5 million, compared to net income of $11.2 million, or $0.29 per diluted share, on revenue of approximately $367 million for the same period in the prior year. Additionally, for 2014, the Individual Defendants reported net income of $52 million, or $1.32 per diluted share, on revenue of $1.9 billion, compared to net income of $49 million, or $1.29 per diluted share, on revenue of $1.3 billion for 2013. The Individual Defendants also alleged that there was a $44.5 million decrease in accounts receivable and a $10.9 million increase in accounts payable for 2014. In the section entitled "Controls and Procedures – Evaluation of Disclosure Controls and Procedures," the Individual Defendants reiterated that the Company's disclosure controls and procedures were effective. Moreover, in the section entitled "Controls and Procedures – Management's Report on Internal Control Over Financial Reporting," the Individual Defendants declared that management

is "responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." The Individual Defendants, despite this responsibility, claimed that there was no material change in the Company's internal controls over financial reporting. Defendants DiBlasi, Armbruster, Rued, Doerr, Kennedy, Staley, Urkiel, Utrup, and Vijums signed the Form 10-K including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

80.     On April 7, 2015, defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup, and Vijums caused Roadrunner to file its 2015 Proxy Statement on Form DEF 14A with the SEC (the "2015 Proxy"). Those defendants stated in the 2015 Proxy that the Board was committed to risk oversight, the Audit Committee exercised oversight of the Company's financial statements, and Roadrunner's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's annual report. The 2015 Proxy also included a vote on the election of the Board, including defendants Urkiel, Utrup, and Vijums.

81.     On May 7, 2015, Roadrunner filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2015 with the SEC. For the quarter, despite on-going accounting issues, the Individual Defendants reported net income of $13.6 million, or $0.35 per diluted share, on revenue of approximately $489 million, compared to net income of $10.4 million, or $0.27 per diluted share, on revenue of $382 million for the same period in the prior year. The

Individual Defendants also reported a $3.9 million decrease in accounts receivable, and an $11.3 million decrease in accounts payable. The Individual Defendants, in the section entitled "Controls and Procedures," repeated the assertion that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

82.     On July 28, 2015, Roadrunner announced in a press release that it had acquired Stagecoach Cartage and Distribution, a provider of truckload and logistics services based in El Paso, Texas, for a total purchase price of $35 million, plus an earn-out capped at $5 million. In the press release, defendant DiBlasi claimed that the acquisition "provides us with immediately realizable growth opportunities created by the accelerating demand within the region."

83.     On August 3, 2015, Roadrunner filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2015 with the SEC. The Individual Defendants reported net income of $16.5 million, or $0.42 per diluted share, on revenue of $517.9 million, compared to net income of $14.8 million, or $0.38 per diluted share, on revenue of $460.2 million for the same period in the prior year, despite continued accounting issues. The Individual Defendants also reported a $28 million decrease in accounts receivable, and a $5.5 million decrease in accounts payable. The Individual Defendants, in the section entitled "Controls and Procedures," repeated the assertion that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting.

Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

84.     On September 28, 2015, Roadrunner announced in a press release that on September 24, 2015, the Company expanded its existing credit facility to $700 million from $550 million through 2019. Defendant DiBlasi averred that "[t]he amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions."

85.     In fiscal year 2015, Roadrunner's issues with its debt load and the Company's ability to meet the maximum cash flow leverage ratio set by the covenants with the Company's lenders became more apparent. The covenants with the Company's lenders set strict limits for the ratio of Roadrunner's total funded debt to its earnings before interest, tax, depreciation, and amortization ("EBITDA"), referred to as the maximum cash flow leverage ratio. Particularly, during a November 5, 2015 earnings call about the Company's third fiscal quarter of 2015, defendant Armbruster acknowledged that with net debt load so high, at $449 million, the Company's current cash flow leverage ratio was 3.75, with "about a quarter room on that." This ratio was dangerously close to the limits set by the lenders' covenants.

86.     On November 9, 2015, Roadrunner filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015 with the SEC. For the quarter, the Individual Defendants reported net income of $5.8 million, or $0.15 per diluted share, on revenue of $497.2 million, compared to net income of $14.4 million, or $0.37 per diluted share, on revenue of

$498.1 million for the same period in the prior year. The Individual Defendants also alleged a $3.3 million decrease in accounts receivable, and a $9.9 million decrease in accounts payable. The Individual Defendants, in the section entitled "Controls and Procedures," reiterated the assertion that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

87.     Roadrunner's issue with its burdensome debt load and decreasing cash flows due to its tenuous acquisition strategy continued into 2016. During a February 3, 2016 earnings call discussing the Company's fourth fiscal quarter for 2015, defendant Armbruster stated that issues with the Company's cash flow leverage ratio had shifting corporate focus. Defendant Armbruster acknowledged during the call that "[w]hile our focus over the past several years has been on strategic growth and acquisition initiatives to position us for the long-term, our focus in 2016 will be an enhancing cash flow from operations and reducing our leverage ratio towards, our long-term goal of less than 2.5 times EBITDA."

88.     On March 1, 2016, Roadrunner filed its Annual Report on Form 10-K, announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2015 with the SEC. Omitting on-going accounting issues, the Individual Defendants reported net income of $12.1 million, or $0.32 per diluted share, on revenue of $491 million, compared to net income of $12.4 million, or $0.32 per diluted share, on revenue of

$532.5 million for the same period in the prior year for the quarter. For 2015, the Individual Defendants purported that net income was $48 million, or $1.23 per diluted share, on revenue of $2 billion, compared to net income of $52 million, or $1.32 per diluted share, on revenue of $1.9 billion for 2014. The Individual Defendants also alleged a $14 million increase in accounts receivable and a $15.7 million decrease in accounts payable for 2015. Moreover, in the section entitled "Controls and Procedures – Management's Report on Internal Control Over Financial Reporting," the Individual Defendants declared that management is "responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." The Individual Defendants, despite this responsibility, claimed no change in the Company's internal controls over financial reporting. Defendants DiBlasi, Stoelting, Armbruster, Rued, Doerr, Kennedy, Staley, Urkiel, Murray, Vijums, and Ward signed the Form 10-K including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

89.     On April 6, 2016, defendants DiBlasi, Stoelting, Doerr, Kennedy, Murray, Rued, Staley, Urkiel, Vijums, and Ward caused Roadrunner to file its 2016 Proxy Statement on Form DEF 14A with the SEC (the "2016 Proxy"). Those members of the Board stated in the 2016 Proxy that they were committed to risk oversight, the Audit Committee exercised oversight of the Company's financial statements, and Roadrunner's financial statements were accurate, and

therefore appropriate for the Board's approval in the Company's annual report. The 2016 Proxy also included a vote on the election of the Board, including defendants DiBlasi, Rued, and Kennedy.

90.     On May 10, 2016, Roadrunner filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016 with the SEC. For the quarter, the Individual Defendants reported net income of $3.1 million, or $0.08 per diluted share, on revenue of $465.6 million, compared to net income of $13.6 million, or $0.35 per diluted share, on revenue of $489 million for the same period in the prior year. The Individual Defendants also reported a $3.4 million increase in accounts receivable, and a $7 million increase in accounts payable. The Company disclosed that there was "a risk that we may not be in compliance with our financial covenants as of the end of the second quarter." Despite this, the Individual Defendants, in the section entitled "Controls and Procedures," reiterated the assertion that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting.

91.     On June 2, 2016, the SEC sent a letter to Roadrunner inquiring into the Company's operating metrics, interim goodwill impairment analysis, and compliance with its financial covenants. In response, defendant CFO Armbruster, on behalf of Roadrunner, stated that the Company had met with its primary lending group to amend the credit agreement, including modifications to the specified fixed charge coverage ratio and cash flow leverage ratio for the quarters ended June, 30, 2016, September 30, 2016, December 31, 2016, March 31, 2017, and June 30, 2017.

92.     On June 23, 2016, in a Current Report on Form 8-K filed with the SEC, Roadrunner stated that on June 17, 2016, the Company had entered into a consent, waiver, and first amendment to its credit agreement, increasing the maximum cash flow leverage ratio.

93.     During a July 27, 2016 earnings call with analysts and investors, it became apparent the need for a credit agreement amendment. Even with an increased maximum cash flow leverage ratio of 4.5 set by the agreement, defendant Armbruster revealed that the Company's cash flow leverage ratio at the end of the second fiscal quarter of 2016 was 4.3.

94.     On August 8, 2016, Roadrunner filed its Quarterly Report on Form 10-Q for the second quarter, ended June 30, 2016 with the SEC. Without mentioning any on-going accounting issues, the Individual Defendants alleged that net income was $1.8 million, or $0.05 per diluted share, on revenue of $483.43 million, compared to net income of $16.5 million, or $0.42 per diluted share, on revenue of $517.9 million for the same period in the prior year. The Individual Defendants also reported a $2.35 million decrease in accounts receivable, and a $14.5 million increase in accounts payable. The Individual Defendants, in the section entitled "Controls and Procedures," reiterated the assertion that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

95.     On November 2, 2016, the Company held an earnings call with analysts and investors. Without revealing the full extent of the Company's accounting errors, defendant

Armbruster stated that the Company's cash flow leverage ratio was approximately 3.99 "which is at the maximum currently allowed by our bank credit facility."

## ROADRUNNER REVEALS AN ACCOUNTING ERROR IN
## ITS CASH FLOW LEVERAGE RATIO CALCULATION

96.     Then, on November 10, 2016, Roadrunner filed a Notification of Late Filing on Form 12b-25 with the SEC. Revealing a significant accounting error that prevented filing its Form 10-Q for the third quarter ended September 30, 2016, the Company had identified mistakes in its calculation of its cash flow leverage ratio for an entire fiscal year. The Form 12b-25 stated:

### PART III
### NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

*Roadrunner Transportation Systems, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q")* within the prescribed time period without unreasonable effort or expense for the reasons described below.

On November 4, 2016, during the preparation and review of the Company's quarterly compliance certificate required under its credit agreement, *the Company identified a mistake in the calculation of its cash flow leverage ratio for the four quarters ended September 30, 2016. Based on the corrected calculation,* upon the delivery of the quarterly compliance certificate (required to be delivered by November 14, 2016), *the Company would not be in compliance with its cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016 absent a waiver of such anticipated non-compliance by the required lenders under the credit agreement.* Since discovering the mistake, the Company has been in ongoing discussions with U.S. Bank National Association ("U.S. Bank") and the other lenders under its credit agreement with respect to a waiver of the Company's anticipated non-compliance with, and any actual or potential event of default resulting from such anticipated non-compliance with, the cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016. As a result of those ongoing discussions and other related matters that have required the attention of senior management and other key personnel, the Company could not, without unreasonable effort and expense, complete its financial statements for the three and nine months ended September 30, 2016 and related disclosures and, consequently, could not file its Q3 2016 Form 10-Q

within the prescribed time period. The Company currently intends to file the Q3 2016 Form 10-Q within 5 calendar days of its prescribed due date.

97. Despite on-going red flags showing accounting issues and a lack of internal controls over the Company's financial reporting, on November 14, 2016, Roadrunner filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016 with the SEC. For the quarter, the Individual Defendants alleged net income of $7.9 million, or $0.21 per diluted share, on revenue of $532.2 million, compared to net income of $5.8 million, or $0.15 per diluted share, on revenue of $497.2 million for the same period in the prior year. The Individual Defendants also reported a $39.6 million decrease in accounts receivable, and a $48.3 million increase in accounts payable. In the section entitled "Liquidity and Capital Resources," the Company stated that it was "probable that we will not be in compliance with our cash flow leverage ratio as of December 31, 2016." Despite this admission, in the section entitled "Controls and Procedures," the Individual Defendants maintained that the Company's disclosure controls and procedures were effective, and there was no change in its internal controls that had materially affected its financial reporting. Defendant DiBlasi and Armbruster signed the Form 10-Q including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

## THE FALSE AND MISLEADING 2015 PROXY

98. On April 7, 2015, defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup, and Vijums caused Roadrunner to file with the SEC its 2015 Proxy in connection with the 2015 Annual Meeting of Stockholders, held on May 13, 2015. In the 2015 Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Urkiel, Utrup, and Vijums

to the Board. Defendants negligently issued materially misleading statements with respect to these solicited votes. Plaintiff disclaims any claim of fraud or knowing wrongdoing in connection with the misleading statements in the 2015 Proxy.

99. In support of reelecting defendants Urkiel, Utrup, and Vijums, the 2015 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) Roadrunner's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's annual report. The 2015 Proxy stated:

### Role of the Board of Directors in Risk Management and Oversight

While our management is primarily responsible for managing risk, *our board of directors and each of its committees plays a role in overseeing our risk management practices. The role of our board of directors in our company's risk oversight process includes receiving reports from members of senior management on areas of material risk to our company, including operational, financial, legal and regulatory, and strategic and reputational risks. Our board of directors receives these reports from the appropriate executive within our organization to enable it to understand our risk identification, risk management, and risk mitigation strategies.* This direct communication from management enables our board of directors to coordinate its risk oversight role, particularly with respect to risk interrelationships within our organization. Our board of directors believes that its leadership structure has the effect of enhancing its risk oversight function because of the chairman's direct involvement in risk oversight matters and his strong efforts to increase open communication regarding risk issues among directors and the committees of our board of directors. Our board of directors also believes that Mr. Rued's knowledge of our company's business, industry, and risks significantly contributes to our board of directors' understanding and appreciation of risk issues.

Our board of directors allocates responsibility for overseeing risk management for our company among the board and each of its committees. Specifically, the full board oversees significant risks primarily relating to operations, strategy, and finance. In addition, each of our committees considers risks within its area of responsibilities, as follows:

- *Our audit committee is primarily responsible for overseeing matters*

*involving major financial risk exposures and actions management is taking to monitor such risk exposures. This includes risks relating to financial reporting and internal controls; litigation; tax matters; liability insurance programs; and compliance with legal and regulatory requirements and our code of ethics. In addition, our audit committee reviews our quarterly and annual financial reports, including any disclosure in those reports of risk factors affecting our company and business.*

\* \* \*

Through the activities of our audit, compensation, and nominating/corporate governance committees, as well as our board of directors' interactions with management concerning our business and the material risks that may impact our company, our board of directors is able to monitor our risk management process and offer critical insights to our management.

\* \* \*

## REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

Our board of directors has appointed an audit committee consisting of three independent directors. All members of our audit committee are able to read and understand fundamental financial statements, including our balance sheet, income statement, and cash flow statement. All members of our audit committee have past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background which results in each individual's financial sophistication, including being or having been a chief executive officer, chief financial officer, or other senior officer with financial oversight responsibility. Our board of directors has determined that Messrs. Utrup, Kennedy, and Urkiel are independent directors, as defined by Section 303A of the NYSE Listed Company Manual, and that Mr. Utrup, chairman, qualifies as an "audit committee financial expert."

*The primary responsibility of our audit committee is to assist our board of directors in fulfilling its responsibility to oversee management's conduct of our financial reporting process, including overseeing the financial reports and other financial information provided by us to governmental or regulatory bodies (such as the SEC), the public, and other users thereof; our systems of internal accounting and financial controls; and the annual independent audit of our consolidated financial statements.*

*Management has the responsibility for our consolidated financial statements and the reporting process, including the systems of internal controls.* Our independent registered public accounting firm engaged to conduct the audit of our 2014 financial statements, Deloitte & Touche LLP, is responsible for auditing our

consolidated financial statements and expressing an opinion on the conformity of those audited consolidated financial statements with generally accepted accounting principles.

*In fulfilling its oversight responsibilities, our audit committee reviewed and discussed our consolidated audited financial statements with management and the independent registered public accounting firm.* Our audit committee discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 16, Communication with Audit Committees. *This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with our audit committee under generally accepted auditing standards.* In addition, our audit committee received from the independent registered public accounting firm written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's independence. Our audit committee also discussed with the independent registered public accounting firm their independence from management and our company, including the matters covered by the written disclosures and letter provided by the independent registered public accounting firm. Our audit committee has concluded that Deloitte & Touche LLP is independent from our company and management.

Our audit committee discussed with the independent registered public accounting firm the overall scope and plans for their audits. Our audit committee met with the independent registered public accounting firm, with and without management present, to discuss the results of their examinations, their evaluations of our company, the internal controls, and the overall quality of our financial reporting. Our audit committee held nine meetings during the fiscal year ended December 31, 2014.

*Based on the reviews and discussions referred to above, our audit committee recommended to our board of directors, and our board of directors approved, that our audited consolidated financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2014 for filing with the SEC.*

Our board of directors has adopted a written charter for our audit committee that reflects, among other things, requirements of the Sarbanes-Oxley Act of 2002, rules adopted by the SEC, and rules of the NYSE.

This report has been furnished by our audit committee to our board of directors.

100.     Defendants' statements misleadingly suggested that the Board: (i) maintained

sufficient compliance, internal control, review, and reporting programs to identify and address

misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices. The 2015 Proxy omitted any disclosures that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first fiscal quarter of 2014 overstated the estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company's Morgan Southern and Bruenger subsidiaries engaged in improper accounting practices.

101. The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements. Most importantly, the Company was not correctly accounting for its revenues and earnings, and therefore, its financial statements were not appropriate to include in the Company's annual report. Defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup, and Vijums were negligent in making these misleading statements in the 2015 Proxy.

102. The 2015 Proxy harmed Roadrunner by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the defendants' misleading statements in the 2015 Proxy, Roadrunner's stockholders voted to reelect defendants Urkiel, Utrup, and Vijums to Roadrunner's Board.

## THE FALSE AND MISLEADING 2016 PROXY

103. On April 6, 2016, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward caused Roadrunner to file with the SEC its 2016 Proxy in connection with the 2016 Annual Meeting of Stockholders, held on May 18, 2016. In the 2016

Proxy, defendants solicited stockholder votes to, among other things, reelect defendants DiBlasi, Kennedy, and Rued to the Board. Defendants negligently issued materially misleading statements with respect to these solicited votes. Plaintiff disclaims any claim of fraud or knowing wrongdoing in connection with the misleading statements in the 2016 Proxy.

104. In support of reelecting defendants DiBlasi, Kennedy, and Rued, the 2016 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) Roadrunner's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's annual report. The 2016 Proxy stated:

**Role of the Board of Directors in Risk Management and Oversight**

While our management is primarily responsible for managing risk, *our board of directors and each of its committees plays a role in overseeing our risk management practices. The role of our board of directors in our company's risk oversight process includes receiving reports from members of senior management on areas of material risk to our company, including operational, financial, legal and regulatory, and strategic and reputational risks. Our board of directors receives these reports from the appropriate executive within our organization to enable it to understand our risk identification, risk management, and risk mitigation strategies. This direct communication from management enables our board of directors to coordinate its risk oversight role, particularly with respect to risk interrelationships within our organization.* Our board of directors believes that its leadership structure has the effect of enhancing its risk oversight function because of the chairman's direct involvement in risk oversight matters and his strong efforts to increase open communication regarding risk issues among directors and the committees of our board of directors. Our board of directors also believes that Mr. Rued's knowledge of our company's business, industry, and risks significantly contributes to our board of directors' understanding and appreciation of risk issues.

Our board of directors allocates responsibility for overseeing risk management for our company among the board and each of its committees. Specifically, the full board oversees significant risks primarily relating to operations, strategy, and finance. In addition, each of our committees considers risks within its area of responsibilities, as follows:

Through the activities of our audit, compensation, and nominating/corporate governance committees, as well as our board of directors' interactions with management concerning our business and the material risks that may impact our company, our board of directors is able to monitor our risk management process and offer critical insights to our management.

\* \* \*

## REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

Our board of directors has appointed an audit committee consisting of three independent directors. All members of our audit committee are able to read and understand fundamental financial statements, including our balance sheet, income statement, and cash flow statement. All members of our audit committee have past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background which results in each individual's financial sophistication, including being or having been a chief executive officer, chief financial officer, or other senior officer with financial oversight responsibility. Our board of directors has determined that Messrs. Murray, Kennedy, and Urkiel are independent directors, as defined by Section 303A of the NYSE Listed Company Manual, and that Mr. Murray, chairman, qualifies as an "audit committee financial expert."

*The primary responsibility of our audit committee is to assist our board of directors in fulfilling its responsibility to oversee management's conduct of our financial reporting process, including overseeing the financial reports and other financial information provided by us to governmental or regulatory bodies (such as the SEC), the public, and other users thereof; our systems of internal accounting and financial controls; and the annual independent audit of our consolidated financial statements.*

*Management has the responsibility for our consolidated financial statements and the reporting process, including the systems of internal controls.* Our independent registered public accounting firm engaged to conduct the audit of our 2015 financial statements, Deloitte & Touche LLP, is responsible for auditing our consolidated financial statements and expressing an opinion on the conformity of those audited consolidated financial statements with generally accepted accounting principles.

*In fulfilling its oversight responsibilities, our audit committee reviewed and discussed our consolidated audited financial statements with management and the independent registered public accounting firm.* Our audit committee discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 16, Communication with Audit Committees. *This included a discussion of the independent registered public accounting firm's judgments as to the quality, not*

*just the acceptability, of our accounting principles and such other matters as are required to be discussed with our audit committee under generally accepted auditing standards.* In addition, our audit committee received from the independent registered public accounting firm written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's independence. Our audit committee also discussed with the independent registered public accounting firm their independence from management and our company, including the matters covered by the written disclosures and letter provided by the independent registered public accounting firm. Our audit committee has concluded that Deloitte & Touche LLP is independent from our company and management.

Our audit committee discussed with the independent registered public accounting firm the overall scope and plans for their audits. Our audit committee met with the independent registered public accounting firm, with and without management present, to discuss the results of their examinations, their evaluations of our company, the internal controls, and the overall quality of our financial reporting. Our audit committee held nine meetings during the fiscal year ended December 31, 2015.

*Based on the reviews and discussions referred to above, our audit committee recommended to our board of directors, and our board of directors approved, that our audited consolidated financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2015 for filing with the SEC.*

Our board of directors has adopted a written charter for our audit committee that reflects, among other things, requirements of the Sarbanes-Oxley Act of 2002, rules adopted by the SEC, and rules of the NYSE.

This report has been furnished by our audit committee to our board of directors.

105.    Defendants' statements misleadingly suggested that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices. The 2016 Proxy omitted any disclosures that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first fiscal quarter of 2014 overstated the estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded

expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company's Morgan Southern and Bruenger subsidiaries engaged in improper accounting practices.

106.    The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements. Most importantly, the Company was not correctly accounting for its revenues and earnings, and therefore, its financial statements were not appropriate to include in the Company's annual report. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward were negligent in making these misleading statements in the 2016 Proxy.

107.    The 2016 Proxy harmed Roadrunner by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the defendants' misleading statements in the 2016 Proxy, Roadrunner's stockholders voted to reelect defendants DiBlasi, Kennedy, and Rued to Roadrunner's Board.

## THE TRUTH REGARDING ROADRUNNER'S LACK OF INTERNAL CONTROLS EMERGES

108.    The full extent of the Company's lack of internal controls over its financial reporting and Individual Defendants' wrongdoing emerged on January 30, 2017. After the markets had closed that day, Roadrunner issued a press release entitled "Roadrunner Transportation Systems Announces Restatement of Prior Period Financial Statements," attached to a Current Report on Form 8-K filed with the SEC. In the press release, the Company admitted that *all* of its financial statements made in its annual Forms 10-K for fiscal years ended December 31, 2014 and 2015 and quarterly Forms 10-Q for the quarters ended March 31, 2014 to September 30, 2016 filed with the SEC, could not be relied upon. Finally acknowledging to

the public that it lacked internal controls for at least the previous three years, the Company

announced that accounting discrepancies existed at two of its operating subsidiaries, Morgan

Southern and Bruenger, acquired by the Company in 2011. The accounting errors would require

an estimated $20 million to $25 million adjustment on operating income overall. Roadrunner

also disclosed that additional material accounting adjustments could be found during the

Company's investigation. The press release stated:

> Roadrunner Transportation Systems, Inc. ("Roadrunner") (NYSE: RRTS), a
> leading asset-light transportation and logistics service provider, announced today
> that on January 27, 2017 its Audit Committee, after considering the
> recommendation of management, concluded that, as a result of the information
> obtained to date in connection with an ongoing investigation described below, the
> following financial statements and associated reports of Roadrunner's independent
> registered public accounting firm, Deloitte & Touche LLP, previously filed with
> the Securities and Exchange Commission ("SEC") should no longer be relied
> upon:
>
> - the audited consolidated financial statements and unaudited quarterly
>   information included in Roadrunner's Annual Report on Form 10-K for
>   the year ended December 31, 2014;
>
> - the unaudited condensed consolidated financial statements included in
>   Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended
>   March 31, 2014, June 30, 2014, and September 30, 2014;
>
> - the audited consolidated financial statements and unaudited quarterly
>   information included in Roadrunner's Annual Report on Form 10-K for
>   the year ended December 31, 2015;
>
> - the unaudited condensed consolidated financial statements included in
>   Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended
>   March 31, 2015, June 30, 2015, and September 30, 2015; and
>
> - the unaudited condensed consolidated financial statements included in
>   Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended
>   March 31, 2016, June 30, 2016 and September 30, 2016.
>
> Similarly, related press releases, investor presentations or other communications
> describing Roadrunner's financial statements for these periods should no longer
> be relied upon.

In November 2016, *Roadrunner was made aware of various potential accounting discrepancies at its Morgan Southern and Bruenger operating subsidiaries*. In response, Roadrunner's Board of Directors immediately commenced an investigation of the discrepancies with the assistance of Greenberg Traurig, LLP, as outside counsel, and RubinBrown LLP, as forensic accountants. *The investigation into these discrepancies is still ongoing*; however, *based on the investigation to date, Roadrunner has identified various accounting errors that it currently estimates will require prior period adjustments to Roadrunner's results of operations of between $20 million and $25 million.*

*These errors principally relate to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables.* As the investigation is ongoing, the estimated amount is preliminary and could change materially. *The investigation to date has disclosed that the accounting discrepancies may also affect periods prior to the periods set forth above.* Roadrunner has not yet completed its analysis, however, to determine which prior periods may be affected. In addition, Roadrunner has begun to undertake a significant effort to determine if similar discrepancies and internal control deficiencies impacted other operating entities that were not part of the investigation. Therefore, *there may be additional accounting adjustments as a result of these efforts and such adjustments may be material.*

In addition, in conjunction with the investigation, Roadrunner is reassessing its internal controls over financial reporting and its compliance programs. *The result of this reassessment could lead Roadrunner to conclude that there were deficiencies in Roadrunner's internal controls over financial reporting that constitute material weaknesses* and would therefore effect the conclusions regarding effectiveness previously expressed in Item 9A, Controls and Procedures, of Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015.

109. Further, in the Form 8-K section entitled "Material Impairments," the Company revealed that it would record a non-cash goodwill impairment charge in the range of $175 million to $200 million, further demonstrating the damage done to the Company's reputation.

110. On this news, Roadrunner's market capitalization plunged more than 31%, or $3.62 per share, on January 31, 2017, to close at $7.92 compared to the previous trading day's closing of $11.54, erasing almost $138.8 million, or 31%, in market capitalization in a single day.

111.     On January 31, 2017, defendants held an earnings conference call for investors and analysts. Defendant Stoelting acknowledged that "high levels of growth had put some stress and stretched the organizational structure that was in place," and that the Company could have "more oversight from a corporate point of view."

112.     Also in the wake of the Company's revelation that it would need to refile its annual Forms 10-K and quarterly Forms 10-Q for the previous three years, Roadrunner terminated its CFO, defendant Armbruster, on March 29, 2017. On May 24, 2017, the Company announced that it had appointed Terence R. Rogers to be its CFO, replacing defendant Armbruster.

113.     On June 12, 2017, the Company filed a Current Report on Form 8-K with the SEC announcing that on May 18, 2017, the Board increased its size from ten to twelve members. The Form 8-K also advised that on June 6, 2017, the Board appointed director defendants Dobak and Kittle to the Board without a stockholder vote. Defendant Dobak is the current CEO of Dicom, a competing transportation service corporation.

114.     To date, Roadrunner has not filed an annual report with the SEC for the fiscal year ended December 31, 2016, instead filing a Notification of Late Filing on Form 12b-25 on March 17, 2017, notifying the SEC that its Form 10-K would be filed late. In the Form 12b-25, the Company acknowledged that it had experienced delays in assembling all required information for its audited financial statements due to the delays mentioned above. Roadrunner's stock has yet to recover, remaining below $7.50 per share as of the filing of this complaint.

## REASONS THE STATEMENTS WERE IMPROPER

115.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company lacked effective internal control over its financial reporting;

(b)    the Company's financial statements starting in the first fiscal quarter of 2014 overstated the estimated results of operations;

(c)    the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul and other driver payables;

(d)    the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy;

(e)    the Company's Morgan Southern and Bruenger subsidiaries engaged in improper accounting practices; and

(f)    as a result of the foregoing, the officers' and directors' representations concerning the Company's internal controls of its financial reporting were improper.

## THE INDIVIDUAL DEFENDANTS FAILED TO HOLD AN ANNUAL MEETING OF STOCKHOLDERS IN VIOLATION OF THE BY-LAWS AND DELAWARE LAW

116.    Under Article 1, section 1.2 of the Company's Second Amended and Restated By-Laws, titled "Annual Meetings," the Board is required to designate a time for "[t]he annual meeting of the stockholders." Further, Section 211 requires the annual stockholders meeting to be held within thirteen months of the previous meeting.

117.    In the aftermath of Roadrunner's revelations regarding its accounting issues, the Company has not provided notice to stockholders of any impending annual meeting or Board

election. On March 17, 2017, the Company filed a Notification of Late Filing on Form 12b-25 with SEC, providing notice that the Company would not be filing its annual Form 10-K on time. Also, the Company has yet to file a 2017 Proxy Statement with the SEC announcing its annual meeting.

118. Most importantly, to date, the Company still has not held its Annual Meeting of Stockholders for 2017. In fact, the last time the Company held its Annual Meeting of Stockholders was on May 18, 2016, more than thirteen months ago. Thus, Roadrunner is in violation of its By-Laws and Delaware Law, wrongfully denying the Company's stockholders their important rights to voice their frustrations at an annual meeting or by withholding their votes for the directors that have breached their fiduciary duties.

119. This failure to hold an Annual Meeting of Stockholders is particularly egregious here given the misleading 2015 Proxy and 2016 Proxy (collectively, the "Proxies") and the additional appointments to the Board.

## THE INDIVIDUAL DEFENDANTS VIOLATED SECTION 8 BY APPOINTING DEFENDANT DOBAK TO THE ROADRUNNER BOARD

120. Roadrunner's newly appointed director, defendant Dobak, is an interlocking director within the meaning of Section 8. On May 18, 2017, the Board appointed defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the position of director on the Board without an election of the stockholders.

121. Upon information and belief, Roadrunner and the privately-traded Dicom each have a combined capital, surplus, and undivided profit exceeding $32,914,000. Both are engaged in commerce. The two companies compete with one another providing, among other things, transportation logistics, full truckload and LTL services, and TMS in the United States.

122.     Roadrunner provides transportation services through a suite of global supply chain solutions, including TL, customized and expedited LTL, intermodal solutions, freight consolidation, inventory management, expedited services, air freight, international freight forwarding, customs brokerage, and TMS, primarily in the United States. The Company splits its operations into three segments: TL, LTL, and Global Solutions. According to the Company's most recent Annual Report on Form 10-K filed on March 1, 2016 with the SEC, the Company reported total revenues for fiscal year 2015 to be nearly $2 billion. TL accounted for 58.9% of the Company's revenues at approximately $1.2 billion. The next largest segment at 25.9% of revenues, LTL, accounted for $516 million of the Company's total revenue. Global Solutions provided an additional $330 million, or 16.6%, of total revenues.

123.     Dicom also provides transportation services that overlap with the services provided by Roadrunner. Dicom engages in commerce and provides full TL, LTL, and TMS services throughout North America, including in the United States. Upon information and belief, Dicom has capital, surplus, and undivided profits exceeding $32,914,000.

124.     Further, upon information and belief, Roadrunner and Dicom's competitive annual sales exceed Section 8's exemptions. Roadrunner and Dicom's competitive annual sales: (i) exceed $3,291,400; (ii) are more than 2% of total sales for either corporation; and (iii) are more than 4% of total sales for each corporation.

125.     The Board breached its fiduciary duty to the Company by causing it to break the law.

## DAMAGES TO ROADRUNNER CAUSED BY THE INDIVIDUAL DEFENDANTS

126.     As a result of the Individual Defendants' improprieties, Roadrunner disseminated improper, public statements concerning the adequacy of the Company's internal controls over its

financial reporting and its growth-through-acquisition corporate strategy. These improper statements have devastated Roadrunner's credibility as reflected by the Company's approximately $138.8 million, or 31%, market capitalization loss.

127. The Individual Defendants' unlawful course of conduct has also subjected the Company to potentially hundreds of millions of dollars in damages in connection with securities class action lawsuits filed in the U.S. District Court for the Eastern District of Wisconsin. The class action lawsuits allege that the Company and certain Individual Defendants violated securities laws by repeatedly misrepresenting that the Company had effective internal control over its financial reporting and disclosure procedures, when in fact the Company's financial statements could not be relied upon.

128. Roadrunner's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Roadrunner's current and potential customers consider a company's trustworthiness, stability, and ability to accurately describe its business operations. As evidence, the Company admitted that it would record a non-cash goodwill impairment charge in the range of $175 million to $200 million. Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial conditions. In the wake of the revelation that the Company miscalculated its cash flow leverage ratio due to accounting errors, Roadrunner's ability to raise equity capital or debt on favorable terms in the future is also now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

129.    Further, as a direct and proximate result of the Individual Defendants' actions, Roadrunner has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)    costs incurred to investigate wrongdoing; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Roadrunner.

## CLASS ACTION ALLEGATIONS

130.    Plaintiff brings certain claims in this action on his behalf and as a class action on behalf of all stockholders of Roadrunner except the Individual Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any Individual Defendant (the "Class").

131.    This action is properly maintainable as a class action.

132.    The Class is so numerous that joinder of all members is impracticable.   According to Roadrunner's last financial statement filed with the SEC, the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2016, there were over 38.3 million shares of Roadrunner stock outstanding as of November 11, 2016.   Upon information and belief, there are thousands  of members of the Class.

133.    There are questions of law and fact which are common to the Class, including, but not limited to, whether the Director Defendants should be held liable for failing to set a time and

date for, and failing to hold, an Annual Meeting of Stockholders since May 18, 2016, and whether plaintiff and the Class are entitled to an order compelling the Director Defendants to convene and hold an Annual Meeting of Stockholders.

134.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

135.    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual Class members that would establish incompatible standards of conduct for the Individual Defendants.

136.    The Individual Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief and/or corresponding declaratory relief is appropriate respecting the Class as a whole.

137.    The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

138.    Plaintiff brings this action derivatively in the right and for the benefit of Roadrunner to redress injuries suffered, and to be suffered, by Roadrunner as a direct result of violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Roadrunner is named as a

nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139. Plaintiff will adequately and fairly represent the interests of Roadrunner in enforcing and prosecuting its rights.

140. Plaintiff was a stockholder of Roadrunner at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Roadrunner stockholder.

141. The current Board of Roadrunner consists of the following twelve individuals: defendants DiBlasi, Dobak, Doerr, Kennedy, Kittle, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

142. As alleged above, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the effectiveness of the Company's internal controls over its financial reporting. Specifically, in public filings filed with the SEC from May 2014 to November 2016, the Board averred to the public that the Company's growth-through-acquisition strategy had a positive effect on its revenues, and that the strategy had a material impact on the Company's overall growth. The Board also claimed that there were no material changes to its internal control over financial reporting or disclosures. This is despite the fact that the financial statements during this three-year period overstated the estimated results of operations, contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul

and other driver payables, and the Company's Morgan Southern and Bruenger subsidiaries engaged in improper accounting practices. In fact, the Company has been forced to record a non-cash goodwill impairment charge in the range of $175 million to $200 million from its acquisition of Morgan Southern and Bruenger. As a result, the Company had to acknowledge that the financial information contained in its public filings for the last three years could not be relied upon.

143. Furthermore, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward allowed Roadrunner to continue to make improper statements regarding the effectiveness of the Company's internal controls over its financial reporting even though they knew that there were pervasive accounting issues prior to the revelation of systematic and pervasive accounting errors on January 30, 2017. For instance, on November 10, 2016, the Company filed a Notification of Late Filing on Form 12b-25 notifying the SEC that it could not file its third fiscal quarter of 2016 Form 10-Q due to a significant accounting error. This demonstrates a sustained and systematic failure of the Board to exercise oversight of its internal controls over financial reporting. Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

144. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward are responsible for the negligently made statements in the materially misleading Proxies. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, an indemnification provided by the Company to defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward does not protect them for violations of section 14(a) in the Proxies. Accordingly, defendants

DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward face a substantial likelihood of liability, excusing a demand.

145.    In fact, the Proxies specifically state that the Audit Committee reviewed the Company's financial statements and recommends its approval in Roadrunner's annual report. The Proxies also stated that the Board approved the inclusion of the incorrect financial statements in the Company's annual report. In particular, on behalf of defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward, the Proxies substantiated that the Audit Committee has reviewed the Company's audited financial statements for fiscal years 2014 and 2015 and recommended to the Board, and the Board has approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal years ended December 31, 2014 and 2015, for filing with the SEC.

146.    Moreover, demand is excused because a majority of the directors, ten out of the current expanded twelve directors, committed the *ultra vires* act of appointing the interlocking director defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the Board without a stockholder vote.    As stated above, this act violates Section 8.    These ten directors are: defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward. As a result, a majority of the current Roadrunner Board faces a substantial likelihood of liability under Section 8.    Furthermore, defendant Dobak is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his position on the Board.    Demand on these current Board members is therefore excused.

147.    Defendants Kennedy, Murray, and Urkiel, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.    Defendants Kennedy,

Murray, and Urkiel are held to higher standards of financial expertise. The Audit Committee's Charter provides that the members must oversee "the accounting and financial reporting processes of the Company and audits of the financial statements of the Company." Moreover the Audit Committee's Charter provides that it is responsible to provide assistance to the Board with respect to its oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications and independence of the Company's independent auditor, and the performance of the Company's internal audit function and independent auditor. Furthermore, the Audit Committee is required to report to the Board any major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies. Thus, defendants Kennedy, Murray, and Urkiel were responsible for knowingly or recklessly allowing the improper statements related to the Company's financial reporting. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Kennedy, Murray, and Urkiel face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused as to Defendants DiBlasi, Rued, Stoelting, and Vijums Because They Lack Independence**

148. The principal professional occupation of defendants DiBlasi, Stoelting, and Vijums is their employment with Roadrunner, pursuant to which they have received and continue to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendants DiBlasi, Stoelting, and Vijums lack independence from defendants Rued, Staley, Doerr, Kennedy, Murray, Urkiel, and Ward due to their interest in maintaining their executive

positions at Roadrunner. This lack of independence renders defendants DiBlasi, Stoelting, and Vijums incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation. Demand is futile as to defendants Stoelting, DiBlasi, and Vijums.

149.    Defendants Rued and Vijums are also employees of HCI. Defendant Rued is the co-founder and a managing partner at HCI, and defendant Vijums is a managing director at HCI. As defendants admit in Roadrunner's Proxy Statements from 2013 to 2016, defendants Rued and Vijums are not considered independent directors as a result of their relationships with HCI, which is affiliated with investment funds that hold a large amount of Roadrunner's stock. Defendants further admit in Proxy Statements from 2013 to 2016 that Roadrunner paid HCI fees and remunerations for services performed in conjunction with acquisitions and debt financing in accordance with advisory agreements. Accordingly, defendants Rued and Vijums lack independence from defendants DiBlasi, Staley, Stoelting, Doerr, Kennedy, Murray, Urkiel, and Ward due to their direct and indirect pecuniary interest in Roadrunner through their employment with HCI. This lack of independence renders defendants Rued and Vijums incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation. Demand is futile as to defendants Rued and Vijums.

150.    Plaintiff has not made any demand on the other stockholders of Roadrunner to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Roadrunner is a publicly held company with over 38.3 million shares outstanding and thousands of stockholders as of November 11, 2016;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.


## COUNT I

### Against Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums, and Ward for Violation of Section 14(a) of the Exchange Act

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except any allegation of fraud.

152.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums, and Ward. The section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

153.    Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums, and Ward negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the Proxies. The Proxies contained proposals to the Company's stockholders that they vote to reelect

the members of the Board. The Proxies, however, misrepresented and failed to disclose and explain that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first fiscal quarter of 2014 overstated the estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company's Morgan Southern and Bruenger subsidiaries engaged in improper accounting practices. By reasons of the conduct alleged herein, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums, and Ward violated section 14(a) of the Exchange Act. As a direct and proximate result of these violations, stockholders voted in favor of reelecting defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup, and Vijums to the Board. Defendants DiBlasi, Kennedy, Murray, Rued, Urkiel, Utrup, and Vijums' reelection led the continuation of the wrongful practices described herein.

154.    Plaintiff, on behalf of Roadrunner, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup, and Vijums based upon the false and misleading Proxies, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

155.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.    The Individual Defendants owed and owe Roadrunner fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Roadrunner the highest obligation of good faith, fair dealing, loyalty, and due care.

157.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Roadrunner, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

158.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first fiscal quarter of 2014 overstated the estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul and other driver payables; and (iv) the Company's Morgan Southern and Bruenger subsidiaries engaged in improper accounting practices.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

159.    Director Defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums, and Ward, as directors of the Company, owed Roadrunner the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper statements.  Defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums, and Ward knew or were reckless in not knowing that: (i) the

Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first fiscal quarter of 2014 overstated the estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul and other driver payables; and (iv) the Company's Morgan Southern and Bruenger subsidiaries engaged in improper accounting practices. Accordingly, defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums, and Ward breached their duty of loyalty to the Company.

160.    Director Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward breached their fiduciary duty and committed the ultra vires act of appointing the interlocking director defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the Board. As stated above, defendant Dobak's service on the Board violates Section 8.

161.    The Audit Committee Defendants Kennedy, Murray, Urkiel, and Utrup breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Kennedy, Murray, Urkiel, and Utrup failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

162.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Roadrunner has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

163.    Plaintiff, on behalf of Roadrunner, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    As a result of the Individual Defendants' reckless growth-through-acquisition strategy, the Company spent hundreds of millions of dollars purchasing various companies to prop up Roadrunner's reported revenues and earnings. In the course of this strategy, the Company purchased Morgan Southern and Bruenger, companies with on-going accounting issues. As a direct result of these reckless purchases, Roadrunner was forced to announce that its financial reporting filed with the SEC from May 2014 to November 2016 could not be relied upon, and that the Company would charge a non-cash goodwill impairment in the range of $175 million to $200 million.

166.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Roadrunner is subject to numerous securities fraud class action lawsuits. The Individual Defendants have caused Roadrunner to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

167.    In addition, the Individual Defendants have caused Roadrunner to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

168.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

169.    Plaintiff, on behalf of Roadrunner, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

170. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Roadrunner. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Roadrunner.

172. Plaintiff, as a stockholder and representative of Roadrunner, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

173. Plaintiff, on behalf of Roadrunner, has no adequate remedy at law.

## COUNT V

### Directly and as a Class Action Defendants DiBlasi, Dobak, Doerr, Kennedy, Kittle, Murray, Rued, Staley, Stoelting, Urkiel, Vijums, and Ward to Compel an Annual Meeting of Stockholders

174. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

175. The Company's last Annual Meeting of Stockholders was held on May 18, 2016.

176. Pursuant to Section 211, Roadrunner is required to hold a meeting of stockholders at least once every thirteen months. Further, pursuant to Article 1, section 1.2 of Roadrunner's Bylaws, the Company must hold its meeting of stockholders at least annually.

177. As a result of the Individual Defendants' wrongdoing, defendants have failed to timely cause Roadrunner to hold an Annual Meeting of Stockholders to elect directors, and there

has been no action by written consent to elect the Company's directors in lieu of an annual meeting. In fact, the Company has appointed two directors to the Board and increased the Board size to twelve members without an election of the stockholders.

178. To remedy defendants' decision to cause Roadrunner's foregoing violation of Delaware law and the Company's Bylaws, the Court should order the Board to promptly schedule, provide notice of, and hold an Annual Meeting of Stockholders.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Roadrunner, demands judgment as follows:

A. Declaring that this action is properly maintainable as a derivative and class action;

B. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C. Directing Roadrunner to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Roadrunner and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen Roadrunner's oversight of its accounting practices;

3. a proposal to strengthen Roadrunner's oversight of its disclosure procedures;

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

5. an order to compel an annual meeting of stockholders and an election for the Board;

6. a provision to prevent the appointment of interlocking directors in violation of Section 8; and

7. a provision to permit the stockholders of Roadrunner to nominate at least three candidates for election to the Board;

D. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Roadrunner has an effective remedy;

E. Awarding to Roadrunner restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F. Directing the Company to hold its Annual Meeting of Stockholders;

G. Directing the Board to remove defendant Dobak from the Board;

H. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 28, 2017

KERKMAN WAGNER & DUNN

s/K. Scott Wagner
K. SCOTT WAGNER
State Bar No. 01004668
839 N. Jefferson St., Suite 400
Milwaukee, WI 53202
Telephone: (414) 277-8200
Facsimile: (414) 277-0100
E-mail: swagner@kwdlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
JENNY L. DIXON
ERIC M. CARRINO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        soddo@robbinsarroyo.com
        jdixon@robbinsarroyo.com
        ecarrino@robbinsarroyo.com

Attorneys for Plaintiff

1183801

## VERIFICATION

I, Jesse Kent, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Class Action and Derivative Complaint for Declaratory Relief, Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 6-23-2017

JESSE KENT