UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

| | |
|---|---|
| IN RE ROADRUNNER TRANSPORTATION SYSTEMS, INC. STOCKHOLDER DERIVATIVE LITIGATION | Civil Action No. 2:17-cv-00893-PP |
| This Document Relates To: <br><br> ALL ACTIONS. | <u>DERIVATIVE ACTION</u> |

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiffs Jesse Kent and Chester County Employees Retirement Fund ("Plaintiffs"), through their attorneys, submit this Verified Consolidated Shareholder Derivative Complaint for Violation of Federal Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiffs' counsel, which included, among other things, a review of public filings with the United States Securities and Exchange Commission ("SEC") and news reports, press releases, analyst reports, and other publicly available sources. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Roadrunner Transportation Systems, Inc. ("Roadrunner" or the "Company") against certain of its current and former officers and/or directors for breach of fiduciary duty, corporate waste, unjust enrichment, and violation of federal securities law.

2. From May 2011 through November 2016 (the "Relevant Period") , Defendants caused the Company to disseminate materially false and misleading information concerning quarterly and annual financial statements of Roadrunner in press releases and in each of the Company's filings with the SEC. The cornerstone of the scheme involved overstatements of net income – more than *$66.5 million* – in Roadrunner's financial statements which arose from the Company's grossly inadequate internal financial reporting controls.

3. Roadrunner provides logistics services designed to get its customers' products to market. These services include truckload logistics ("TL"), customized and expedited less-than-truckload ("LTL"), intermodal solutions, freight consolidation, inventory management, expedited

services, air freight, international freight forwarding, customs brokerage, and transportation management solutions ("TMS"). Roadrunner's operations are classified as so-called "asset-light" because they use third-party transportation providers to provide their logistics services.

4. From the outside, Roadrunner appeared to be a strong leader of industry growth. In reality, appearances were deceiving. In an effort to inflate Roadrunner's revenues and, in turn, its stock price, starting in February 2011 through September 2015, the Company acquired twenty-five non-public companies, expanding the Company's credit facility with its lenders in order to finance this acquisition strategy. This aggressive growth strategy drove Roadrunner's stock price to as high as $30 per share as the Company outwardly reported revenues increasing from $632 million in 2010 to nearly *$2 billion* by 2015.

5. Despite the reported revenue growth, the Company's rapid and reckless expansion strategy created an unwieldy organization comprised of disparate operating units, each with its own accounting systems and policies that were never integrated or synchronized. After each acquisition, Roadrunner's management made virtually no efforts to integrate the newly-acquired companies into its existing operations and the Company has now admitted that it "*had no comprehensive integration plans, no consistent internal control and accounting procedures and no standardized or common finance [] systems*." This failure to integrate the acquisitions allowed a multitude of material accounting irregularities to occur that substantially impacted all financial statement line items and also increased the Company's debt levels and leverage ratios.

6. This systemic failure to implement adequate internal controls was allowed to continue unabated for years, while Roadrunner continued to acquire companies during the Relevant Period. Defendants reported record financial results based in part on the combined revenue synergies and cost savings resulting from the acquisitions. Defendants even assured the

investing public that Roadrunner had successful integration strategies, repeatedly touting its "*proven ability to smoothly integrate each acquired company*." Nothing could have been further from the truth.

7. The Company's lack of a coherent strategy, competent integration team and pervasive integration issues, and the Company's delay in reporting such conduct to the public, were well known to and/or recklessly disregarded by the Company's Board of Directors ("Board"), and in particular, the Board's Audit Committee (the "Audit Committee"), whose members were charged with responsibility to monitor and discuss with management major financial risks and to oversee the integrity of financial statements and disclosures. The Board also remained consciously inactive despite having actual and/or constructive knowledge of unlawful conduct at the Company due to its deficient internal controls, integration problems and red flags of unlawful conduct occurring at the Company, including an SEC inquiry in June 2016.

8. The truth about Roadrunner's misstated financial results and weak internal controls emerged on January 30, 2017, when Roadrunner announced that "accounting discrepancies" were discovered at two of the acquired companies and that the Company was required to restate its financials. In response to these events, the Company initiated an investigation conducted by the Company's Audit Committee and assisted by Greenberg Traurig, LLP as outside counsel (the "Internal Investigation"). A year later, on January 31, 2018, after the Internal Investigation was completed, Roadrunner revealed that the Company was forced to restate net income by at least *$66.5 million* between 2011 and through the third quarter of 2016. The Company also reported a net loss of $35.6 million in 2016, excluding *$373.7 million* in non-cash goodwill impairment charges.

9.     The Internal Investigation revealed a striking lack of strategic planning, often exemplified by nonexistent or insufficient corporate governance protocols and/or lack of internal controls.  The Company admitted that during the Relevant Period, "internal controls failed to prevent or were ***overridden by management*** in certain instances to allow recording accounting entries without appropriate support, recording accounting entries that were inconsistent with information known by management at the time, not communicating relevant information within our organization and, in some cases, withholding information from our independent directors, our Audit Committee, and our independent auditors, which resulted in material accounting errors."

10.    The Internal Investigation has now disclosed that the consistent pressures from top management created an aggressive and competitive culture at the Company that ignored honesty, truthfulness and ethics, creating a corporate culture that was "insufficient to create the proper environment for effective internal control over financial reporting and to ensure that [] there were adequate processes for oversight [and that] there was accountability for the performance of internal control over financial reporting responsibilities."

11.    Defendants' malfeasance, mismanagement and self-dealing have resulted in hundreds of millions of dollars in damage to Roadrunner's reputation, goodwill and standing in the business community.  The revelations concerning the Company's improper accounting, its delayed financial filings, its deficient internal controls and its need to restate its financial results, exposed Roadrunner's true business health and caused its market capitalization to plunge more than 31%, erasing more than $138.8 million in market capitalization.

12.    During the Relevant Period, Defendants were incentivized to issue false and misleading financial reports and statements and then, aware of this adverse material inside information, sell their personally-held Roadrunner shares to the unsuspecting public.  Certain

Defendants have unlawfully reaped over *$184 million* in illegal insider trading proceeds. In addition, during the Relevant Period, while in possession of material non-public information, certain Defendants collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Roadrunner's actual performance while under their stewardship.

13. In addition to lucrative compensation packages paid to senior executives, and director fees paid to the ineffective directors, Roadrunner also expended significant amounts for internal investigation, responses to regulators, and defense of lawsuits. The Company admits it has already incurred approximately $30 million in expenses "including audit, legal, consulting, and other professional fees, as well as fees related to [the credit agreement], in connection with the restatement of our previously issued consolidated financial statements." The Company also admits that it had to expend a significant amount to remediate the material weaknesses in its financial controls.

14. As a direct result of Defendants' wrongdoing, the Company is now the subject of multiple federal securities class action lawsuits (the "Securities Class Actions") filed in the U.S. District Court for the Eastern District of Wisconsin on behalf of investors who purchased Roadrunner's shares alleging violations of the federal securities laws and to pursue remedies under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The Company has also announced that it is the subject of a SEC and U.S. Department of Justice ("DOJ") investigations and is exposed to millions more in potential liability for violations of state and federal law.

15. As detailed herein, the Board remained consciously inactive despite actual and/or constructive knowledge of wrongdoing at Roadrunner, when it ignored red flags indicating severely deficient internal controls, permitted this willful disregard of sufficient internal controls

to continue, and failed to implement any meaningful changes to identify and immediately end the practices. Based on the nature and scope of the breaches of duty, the Board either knew of, or recklessly turned deaf ears and blind eyes to the misstatements and misconduct occurring around them, thereby ignoring the lack of sufficient internal protocols. To this day, the Board has failed to take any action against any executive, officer or director relating to the inadequate internal controls or willful disregard of the controls, which illustrates its lack of independence and continuing conflicts of interest. Indeed, the Company's former Chief Executive Officer ("CEO"), defendant Mark DiBlasi ("DiBlasi"), the architect of the Company's aggressive acquisition strategy, still remains as an employee of the Company and the Vice Chairman of the Board.

16. Further, the Company has not held an Annual Meeting of Stockholders since May 18, 2016, more than 22 months ago. Nor has the Company filed a 2017 Proxy Statement. And despite this glaring failure, Defendants improperly increased the Board's size to 12 members and appointed (without any annual meeting or election) two new directors to the Board on June 6, 2017.[1] Defendants' failure to hold an annual meeting is in violation of title 8, section 211 of the Delaware General Corporation Law Code ("§211") and the Company's By-Laws. As a result, the Company's stockholders have not received updates directly from Roadrunner's Board and they have been unable to voice their frustrations at an annual meeting or by withholding their votes for these faithless fiduciaries.

17. The Board's refusal to hold such a meeting is unsurprising. The last two annual Board elections, held in 2015 and 2016, were tainted. The proxy solicitation requesting stockholders vote in favor of re-electing to the Board defendants William S. Urkiel ("Urkiel"),

---

[1] On June 6, 2017, the Board appointed defendants Scott L. Dobak ("Dobak") and Ralph W. Kittle, III ("Kittle') to the Board.

Chad M. Utrup ("Utrup") and Judith A. Vijums ("Vijums") in 2015 and defendants DiBlasi, John G. Kennedy, III ("Kennedy") and Scott D. Rued ("Rued") in 2016 contained materially false and misleading statements about the Board's oversight of risk, as well as the Company's internal control and disclosure procedures, particularly regarding its accounting practices. If the stockholders knew the truth about Roadrunner's continued lack of internal controls and integration failures, and its accounting improprieties, stockholders would not have voted to re-elect those directors.

18. Moreover, the Board has caused Roadrunner to violate section 8 of the Clayton Act ("§8"), 15 U.S.C. §19, which prohibits a person from serving as a director or officer of two or more corporations that compete.[2] In particular (and again, despite not having a stockholder meeting), the Board approved and appointed defendant Dobak to the Board. Defendant Dobak is the current CEO of Dicom Transportation Group ("Dicom"), and has been since February 2014. Dicom is a competitor of Roadrunner, providing business-to-business expedited transportation services, including offering courier, LTL and truckload delivery services, as well as third-party logistics and TMS. Upon information and belief, Roadrunner's and Dicom's competitive annual sales exceed the statutory threshold.

---

[2] Specifically, §8 prohibits these interlocking directorships when: (i) the combined capital, surplus and undivided profits of each of the corporations exceeds $32,914,000; (ii) each corporation is engaged in commerce; and (iii) the corporations are competitors with certain threshold competitive annual sales. It contains three *de minimis* exceptions that do not apply here, namely if: (i) the competitive sales of either corporation are less than $3,291,400, according to the Federal Trade Commission's adjustment; (ii) the competitive sales of either corporation are less than 2% of that corporation's total sales; or (iii) the competitive sales of each corporation are less than 4% of that corporation's total sales. 15 U.S.C. §19(a)(2)(A)-(C). According to the statute, competitive sales are "the gross revenues for all products and services sold by one corporation in competition with the other, determined on the basis of annual gross revenues for such products and services in that corporation's last completed fiscal year." 15 U.S.C. §19(a)(2)(C). Total sales is further defined as "gross revenues for all products and services sold by one corporation over that corporation's last completed fiscal year." *Id.*

19.     By this action, Plaintiffs seek to rectify the conduct of the individuals bearing ultimate responsibility for the harm to the Company – the members of the Board and senior management – to impose responsibility upon those individuals, and to recover damages sustained to Roadrunner due to Defendants' breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

## JURISDICTION AND VENUE

20.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, as well as violations of section 8 of the Clayton Act, 15 U.S.C. §19.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

21.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper under 28 U.S.C. §1391(a) because Roadrunner maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

23.     Plaintiff Jesse Kent was a stockholder of Roadrunner during the time of the wrongdoing complained of, has continuously held Roadrunner stock since that time, and is a current Roadrunner stockholder.

24.    Plaintiff Chester County Employees Retirement Fund was a stockholder of Roadrunner during the time of the wrongdoing complained of, has continuously held Roadrunner stock since that time, and is a current Roadrunner stockholder.

25.    Nominal defendant Roadrunner is a Delaware corporation and Roadrunner's principal executive offices are located in Downers Grove, Illinois.  Roadrunner works with independent contractors and third-party carriers to provide domestic, international air, and ocean transportation services to customers.  Roadrunner's goal is to reduce operating costs for its customers, improve supply chain efficiency, redirect resources to core competencies, and enhance customer service.  As of December 31, 2015, Roadrunner employed 4,502 personnel and operated more than 100 properties throughout the United States and Canada.  The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RRTS."

**Defendants**

26.    Defendant Curtis W. Stoelting has been Roadrunner's CEO since April 2017 and a director since January 2016.  Stoelting was also Roadrunner's President and Chief Operating Officer from January 2016 to April 2017.  Stoelting knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Stoelting's 2016 executive and director compensation, including incentive compensation, has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC.  However, Stoelting's compensation from Roadrunner is not justified by the Company's performance while under his stewardship.

27.    Defendant Vijums has been Roadrunner's Vice President since March 2007 and a director since March 2005.  Vijums is a Managing Director at HCI Equity Partners ("HCI"), and

has been since 2003. The Company admits in its SEC filings that Vijums is not an independent director due to her relationship with HCI. Vijums knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

28.     Defendant Rued served as Roadrunner's Chairman of the Board from March 2005 to July 2008 and from March 2010 until November 2017 and has been a director since March 2005. Rued is also the co-founder of HCI and a Managing Partner at the firm and has been since 2003. The Company admits in its SEC filings that Rued is not an independent director due to his relationship with HCI. Rued knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. During the Relevant Period and before the fraud was revealed, Rued sold 6.445 million shares of Roadrunner stock at artificially inflated prices based on material non-public information for total proceeds of $159,263,100.

29.     Defendant DiBlasi served as Roadrunner's Interim Vice Chairman of the Board from April 2017 to November 2017 and has served as a director since July 2006. Defendant DiBlasi was also Roadrunner's CEO from January 2006 to May 2017 and President from January 2006 to January 2016. DiBlasi is named as a defendant in the Securities Class Actions complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. DiBlasi knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and

operations. DiBlasi's 2016 executive and director compensation, including incentive compensation, has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. DiBlasi's compensation was not justified by the Company's performance while under his stewardship. During the Relevant Period and before the fraud was revealed, DiBlasi sold 179,177 shares of Roadrunner stock at artificially inflated prices based on material non-public information for total proceeds of $4,687,716.

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $543,885 | $661,534 | - | $8,754 | $1,214,173 |
| 2014 | $498,846 | $370,718 | $163,368 | $4,384 | $1,037,316 |
| 2013 | $457,308 | $424,402 | $98,580 | $8,424 | $988,714 |
| 2012 | $410,385 | $246,139 | $179,305 | $8,274 | $844,103 |
| 2011 | $378,908 | $220,941 | $162,338 | $744 | $762,931 |

30. Defendant James D. Staley ("Staley") served as Roadrunner's Lead Director from November 2016 until November 2017, when he was named Chairman of the Board. Staley has been a director since October 2010. Staley knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Staley's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2011 through 2015, Staley received directors' fees and other compensation from Roadrunner. Staley's compensation is not justified by the Company's performance while under his stewardship:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $38,000 | $60,649 | $98,649 |
| 2014 | $38,000 | $46,345 | $84,345 |

| Year | | | |
|---|---|---|---|
| 2013 | $38,000 | $56,592 | $94,592 |
| 2012 | $38,000 | $37,450 | $75,450 |
| 2011 | $30,000 | $6,277 | $36,277 |

31.     Defendant Christopher L. Doerr ("Doerr") has been a Roadrunner director since October 2010.  Doerr knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Doerr's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC.  In 2011 through 2015, Doerr received directors' fees and other compensation from Roadrunner.  Doerr's compensation is not justified by the Company's performance while under his stewardship:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $35,000 | $60,649 | $95,649 |
| 2014 | $35,000 | $46,345 | $81,345 |
| 2013 | $35,000 | $56,592 | $91,592 |
| 2012 | $35,000 | $37,450 | $72,450 |
| 2011 | $30,000 | $6,277 | $36,277 |

32.     Defendant Kennedy has been a Roadrunner director since December 2012. Kennedy was a member of Roadrunner's Audit Committee from at least April 2013 to at least April 2016.   Kennedy knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Kennedy's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC.  In 2012 through 2015, Kennedy received directors' fees and other compensation from Roadrunner.

Kennedy's compensation is not justified by the Company's performance while under his stewardship:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $35,000 | $60,649 | $95,649 |
| 2014 | $35,000 | $46,345 | $81,345 |
| 2013 | $35,000 | $56,592 | $91,592 |
| 2012 | $1,427 | - | $1,427 |

33.     Defendant Brian C. Murray ("Murray") has been a Roadrunner director since August 2015.  Murray was Chairman of Roadrunner's Audit Committee from August 2015 to at least April 2016.   Murray knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Murray's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC.   In 2015, Murray received directors' fees and other compensation from Roadrunner. Murray's compensation is not justified by the Company's performance while under his stewardship:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $15,583 | $0 | $15,583 |

34.     Defendant Urkiel has been a Roadrunner director since May 2010.  Urkiel was a member of Roadrunner's Audit Committee from at least April 2013 to at least April 2016.  Urkiel knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Urkiel's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC.  In 2011 through 2015,

- 13 -

Urkiel received directors' fees and other compensation from Roadrunner. Urkiel's compensation is not justified by the Company's performance while under his stewardship:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $40,000 | $60,649 | $100,649 |
| 2014 | $40,000 | $46,345 | $86,345 |
| 2013 | $40,000 | $56,592 | $96,592 |
| 2012 | $40,000 | $37,450 | $77,450 |
| 2011 | $35,000 | $6,277 | $41,277 |

35.     Defendant Michael P. Ward ("Ward") has been a Roadrunner director since February 2016. Ward knowingly and recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Ward's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. However, Ward's compensation from Roadrunner not justified by the Company's performance while under his stewardship.

36.     Defendant Ivor J. Evans ("Evans") was a Roadrunner director from March 2005 to April 2014. Evans was Roadrunner's Chairman of the Board from July 2008 to March 2010. Evans was also an Operating Partner at HCI from March 2005 to 2015. Evans knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

37.     Defendant Utrup was a Roadrunner director from May 2010 to September 2015. Utrup was the Chairman of Roadrunner's Audit Committee from at least April 2013 to August 2015 and a member from August 2015 to September 2015. Utrup knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's

financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  In 2011 through 2015, Utrup received directors' fees and other compensation from Roadrunner not justified by the Company's performance while under his stewardship:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $33,750 | $60,649 | $94,399 |
| 2014 | $42,500 | $46,345 | $88,845 |
| 2013 | $42,500 | $56,592 | $99,092 |
| 2012 | $42,500 | $37,450 | $79,950 |
| 2011 | $35,000 | $6,277 | $41,277 |

38.     Defendant Dobak is a Roadrunner director and has been since June 2017.  Dobak is the CEO of Dicom, a corporation in competition with Roadrunner.  Dobak's interlocking directorate violates section 8 of the Clayton Act.

39.     Defendant Kittle is a Roadrunner director and has been since June 2017.

40.     Defendant Peter R. Armbruster ("Armbruster") was Roadrunner's Chief Financial Officer ("CFO"), Treasurer and Secretary from December 2005 to March 2017.  Armbruster was also Roadrunner's Vice President of Finance from December 2005 to January 2015.  Armbruster is named as a defendant in the Securities Class Actions complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Armbruster knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.  Armbruster's 2016 executive compensation, including incentive compensation, has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. Armbruster's compensation is not justified by the Company's performance while under his stewardship.  During

the Relevant Period and before the fraud was revealed, Armbruster sold 189,852 shares of Company stock at artificially inflated prices based on material non-public information for total proceeds of $5,026,138.

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $335,192 | $441,040 | - | $8,754 | $784,986 |
| 2014 | $306,154 | $231,704 | $82,600 | $4,370 | $624,828 |
| 2013 | $281,154 | $248,975 | $45,743 | $8,064 | $583,936 |
| 2012 | $256,923 | $128,412 | $91,794 | $7,914 | $485,043 |
| 2011 | $237,047 | $90,387 | $75,898 | $398 | $403,730 |

41. Defendant Brian J. van Helden ("van Helden") was Roadrunner's Chief Operating Officer from December 2013 to June 2015. Defendant van Helden knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. In 2011 through 2014, van Helden received executive compensation and other compensation from Roadrunner not justified by the Company's performance while under his stewardship. In addition, during the Relevant Period, van Helden sold 103,234 shares of Company stock at artificially inflated prices based on material non-public information for total proceeds of $2,739,969.

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2014 | $371,923 | $278,027 | $102,583 | $3,880 | $756,413 |
| 2013 | $296,154 | $248,975 | $55,815 | $7,916 | $608,860 |
| 2012 | $271,461 | $128,412 | $85,921 | $7,534 | $493,328 |
| 2011 | $242,119 | $90,387 | $79,693 | $173 | $412,372 |

42. The defendants identified in ¶¶26-41 are referred to herein as the "Defendants."

## THE FIDUCIARY DUTIES OF ROADRUNNER'S OFFICERS AND DIRECTORS

43.     Each officer and director of Roadrunner owed the Company and its shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Roadrunner's directors and officers complained of herein involves fraudulent misconduct – a knowing, intentional and culpable violation of their obligations as directors and/or officers of Roadrunner and the absence of good faith on their part concerning their duties to the Company and its shareholders. The misconduct of Roadrunner's officers has been ratified by Roadrunner's Board, which has failed to take any legal action on behalf of the Company against them.

44.     By reason of their positions as officers, directors and/or fiduciaries of Roadrunner and because of their ability to control the business and corporate affairs of Roadrunner, Defendants owed Roadrunner and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage the Company in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Roadrunner and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections and forecasts, (i) so as to fulfill their duty of candor and honesty to Roadrunner's existing shareholders; and (ii) so that the market price of Roadrunner stock would be based on truthful and accurate information.

45.     Defendants, because of their positions of control and authority as Roadrunner's directors and/or officers, were able to and did, directly and indirectly, control the wrongful acts complained of herein.  Because of their executive and directorial positions with Roadrunner, each

defendant had access to adverse non-public information about the financial condition, operations and future business prospects of Roadrunner and was required to disclose it promptly and accurately to Roadrunner shareholders and the financial markets, but did not do so.

46.     Defendants were charged with approving, signing and certifying Roadrunner's quarterly and annual financial reports that were filed with the SEC and contained the false financial results. Moreover, certain defendants on Roadrunner's Audit Committee were responsible for reviewing and discussing the financial information included in Roadrunner's earning announcements, and reviewing the effectiveness and adequacy of Roadrunner's internal controls over financial reporting.

47.     In addition to these duties, under the Audit Committee Charter, as members of the Audit Committee, defendants Kennedy, Murray, Urkiel and Utrup owed specific duties to Roadrunner to assist the Board in overseeing "the accounting and financial reporting processes of the Company and audits of the financial statements of the Company."  Moreover the Audit Committee's Charter provides that its members must assist the Board with respect to its oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications and independence of the Company's independent auditor, and the performance of the Company's internal audit function and independent auditor. Furthermore, the Audit Committee is required to "obtain and discuss with management . . . major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies."  By virtue of such duties and by the terms of the Audit Committee Charter, the Audit Committee members of Roadrunner's Board were required, among other things, to:

**Purpose**

The purpose of the Audit Committee (the "Committee") shall be as follows:

1.     To oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

2.     To provide assistance to the Board of Directors with respect to its oversight of the following:

(a)     The integrity of the Company's financial statements.

(b)     The Company's compliance with legal and regulatory requirements.

(c)     The qualifications and independence of the Company's independent auditor.

(d)     The performance of the Company's internal audit function and independent auditor.

3.     To prepare an audit committee report as required to be included in the Company's annual proxy statement by applicable rules and regulations of the Securities and Exchange Commission ("SEC").

*     *     *

**Duties and Responsibilities**

The Committee shall carry out the duties and responsibilities set forth below.  These functions should serve as a guide with the understanding that the Committee may determine to carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal, or other conditions.  The Committee shall also carry out any other duties and responsibilities delegated to it by the Board of Directors from time to time related to the purposes of the Committee outlined in this Charter. The Committee may perform any functions it deems appropriate under applicable law, rules, or regulations, the Company's bylaws, and the resolutions or other directives of the Board, including review of any certification required to be reviewed in accordance with applicable law or regulations of the SEC.

In discharging its oversight role, the Committee is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate. In this regard and as it otherwise deems appropriate, the Committee shall have the authority, without seeking Board approval, to engage and obtain advice and assistance from outside legal and other advisors as it deems necessary to carry out its duties.  The Committee also shall have the authority to receive appropriate funding, as determined by the Committee, in its capacity as a committee of the Board of Directors, from the Company for the payment of compensation to any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company; to compensate any outside legal or other advisors engaged by the Committee; and to pay the

ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

The Committee shall be given full access to the Company's internal audit group, Board of Directors, corporate executives, and independent auditor as necessary to carry out these responsibilities. While acting within the scope of its stated purpose, the Committee shall have all the authority of the Board of Directors, except as otherwise limited by applicable law.

Notwithstanding the foregoing, the Committee is not responsible for certifying the Company's financial statements or guaranteeing the independent auditor's report. The fundamental responsibility for the Company's financial statements and disclosures rests with management and the independent auditor. It also is the job of the Chief Executive Officer and senior management, rather than that of the Committee, to assess and manage the Company's exposure to risk.

*Documents/Reports Review*

1. Discuss with management and the independent auditor, prior to public dissemination, the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss with the independent auditor the matters required to be discussed by Statement of Auditing Standards No. 61 and PCAOB Auditing Standards No. 1301.

2. Discuss with management and the independent auditor, prior to the Company's filing of any quarterly or annual report, (a) whether any significant deficiencies in the design or operation of internal control over financial reporting exist that could adversely affect the Company's ability to record, process, summarize, and report financial data; (b) the existence of any material weaknesses in the Company's internal control over financial reporting; and (c) the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

3. Discuss with management and the independent auditor the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" or other non-GAAP information), as well as financial information and earnings guidance provided and the type of presentations made to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (*i.e.*, discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

4. Discuss with management and the independent auditor the Company's major financial risk exposures, the guidelines and policies by which risk assessment and management is undertaken, and the steps management has taken to monitor and control risk exposure.

\* \* \*

*Financial Reporting Process*

1. In consultation with the independent auditor, management, and the internal auditor, review the integrity of the Company's financial reporting processes, both internal and external. In that connection, the Committee should obtain and discuss with management and the independent auditor reports from management and the independent auditor regarding (a) all critical accounting policies and practices to be used by the Company and the related disclosure of those critical accounting policies under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements; (c) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor; (d) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (e) major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies; (f) issues with respect to the design and effectiveness of the Company's disclosure controls and procedures, management's evaluation of those controls and procedures, and any issues relating to such controls and procedures during the most recent reporting period; (g) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; (h) any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal auditor, or the independent auditor, relating to the Company's financial statements; and (i) any other material written communications between the independent auditor and the Company's management, including any "management" letter or schedule of unadjusted differences.

2. Review periodically the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company.

3. Review with the independent auditor any audit problems or difficulties encountered and management's response thereto. In this regard, the Committee will regularly review with the independent auditor (a) any audit problems or other difficulties encountered by the auditor in the course of the audit

work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management and (b) management's responses to such matters. Without excluding other possibilities, the Committee may review with the independent auditor (i) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement, and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company.

4.     Advise management, the internal audit department, and the independent auditor that they are expected to provide the Committee a timely analysis of any significant financial reporting issues and practices.

5.     Obtain from the independent auditor assurance that the audit of the Company's financial statements was conducted in a manner consistent with §10A of the Securities Exchange Act of 1934, which sets forth procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934.

6.     Request the internal auditor to provide the Committee with summaries and, as appropriate, the significant reports to management prepared by the internal auditor and any management responses thereto.

7.     Discuss the scope of the annual audit and review the form of the opinion the independent auditor proposes to render.

8.     Review and discuss with management and the independent auditor the responsibilities, budget, and staffing of the Company's internal audit function and any appointment or replacement of the internal auditor or the director of the internal auditing department.

*Legal Compliance/General*

1.     Review periodically, with the Company's legal counsel, any significant legal, compliance, or regulatory matters that may have a material effect on the Company's financial statements or the Company's business or compliance policies, including material notices to or inquiries received from governmental agencies.

2.     Discuss with management and the independent auditor the Company's guidelines and policies with respect to risk assessment and risk management. The Committee will discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     During the Relevant Period, Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to Roadrunner's internal controls and disclosure procedures, as well as the operation of the Company's growth-through-acquisition strategy, which rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Roadrunner, regarding defendants' management of Roadrunner's operations and the adequacy of its internal controls, and disclosure procedures, as well as the integration of acquired companies; and (iii) enhance Defendants' executive and directorial positions at Roadrunner and the profits, power and prestige that Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

50.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time, Defendants caused the Company to issue improper financial statements.

51.     The purpose and effect of defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise Defendants' violation of the securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

52. Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

53. Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

54. Roadrunner is an asset-light transportation and logistics services provider that offers a suite of global supply chain solutions, including TL, customized and expedited LTL, intermodal solutions, freight consolidation, inventory management, expedited services, air freight, international freight forwarding, customs brokerage, and TMS. To provide these services, the Company purchases existing providers with pre-existing transportation equipment and facilities in the small to mid-size range, claiming that its business model makes the Company highly scalable and flexible.

55. Roadrunner's business is divided into three segments: (i) truckload logistics, which arranges the pickup and delivery of truckload, intermodal, and ground and air expedited freight through service centers, company brokers and independent agents; (ii) less than truckload, which involves the pickup, consolidation, linehaul, deconsolidation, and delivery of LTL shipments; and (iii) Global Solutions, which offers domestic and international transportation and logistics

solutions, including domestic and international air and ocean transportation services and customs brokerage.

56.     Since Roadrunner's formation in June 2005, HCI, a private equity firm, has been the Company's largest stockholder, currently owning 24.9% of the Company's outstanding common stock.   HCI provides oversight of Roadrunner's various acquisitions and the corresponding debt financing for those acquisitions in exchange for fees and other remuneration. During the Relevant Period, various HCI affiliates maintained three seats on Roadrunner's Board, including defendants Evans, Rued and Vijums.   Under Defendants' supervision, Roadrunner engaged HCI in several consulting and advisory agreements to assist the Company in its growth-through-acquisition strategy.  During the course of this arrangement, the Company paid HCI $3.5 million in fees and other remuneration.

*The Company's Growth Through Acquisitions*

57.     From its inception, Roadrunner's business strategy was to grow through acquisitions.   According to Roadrunner's initial Registration Statement on Form S-1, filed ahead of the Company's Initial Public Offering on July 24, 2008, the Company stated that it would continue to "develop [as] a full-service transportation and logistics provider under a non-asset based structure through the integration and internal growth of complementary businesses."  The Defendants had high aspirations for Roadrunner's growth, and the executive and strategic decisions at Roadrunner were characterized by rapid growth through acquisitions.

58.     During the Relevant Period, Roadrunner actively pursued its corporate growth strategy by acquiring several additional transportation providers for hundreds of millions of

dollars, assisted by HCI and its affiliates. From February 2011 through September 2015, the Company acquired twenty-five non-public companies:

| Target | Close Date | Size ($mm) |
|---|---|---|
| Morgan Southern, Inc. | Feb-03-2011 | 19.4 |
| Bruenger Trucking, Inc. | May-31-2011 | 13.6 |
| The James Brooks Company Inc. | Aug-01-2011 | 7.6 |
| Prime Logistics Corp. | Aug-31-2011 | 97.5 |
| Capital Transportation Logistics, Inc. | Feb-24-2012 | 7.05 |
| D&E Transport, LLC | Apr-19-2012 | 11.2 |
| CTW Transport Inc. | Jun-04-2012 | 11.0 |
| R&M Transportation, Inc. | Aug-01-2012 | 29.4 |
| Sortino Transportation, Inc. | Aug-01-2012 | 29.4 |
| Expedited Freight Systems, LLC | Aug-10-2012 | 14.0 |
| Central Cal Transportation, LLC | Nov-05-2012 | 8.0 |
| A&A Express, LLC | Nov-12-2012 | 26.5 |
| Direct Connection Transportation | Dec-21-2012 | 2.0 |
| Adrian Carriers, Inc. | Apr-30-2013 | 20.7 |
| Wando Trucking, LLC | Apr-30-2013 | 9.0 |
| Marisol International, LLC | Jul-25-2013 | 68.5 |
| G.W. Palmer Logistics, LLC | Sep-11-2013 | 5.3 |
| Yes Trans, Inc. | Sep-18-2013 | 2.3 |
| Everett Transportation Inc. and Certain Assets of Keith Everett | Feb-24-2014 | 48.0 |
| Rich Logistics | Feb-24-2014 | 48.0 |
| Integrated Services, Inc. and ISI Logistics and ISI Logistics South | Jul-18-2014 | 13.0 |
| Active Aero Group, Inc. | Aug-27-2014 | 115.0 |
| Stagecoach Cartage and Distribution | Jul-28-2015 | 40.0 |
| Southeast Drayage Division | Aug-15-2013 | 1.2 |
| Unitrans International Corporation | Mar-14-2014 | 55.5 |

59.    Together, these transactions were valued at more than $703.15 million, and the majority of them were funded with borrowings under Roadrunner's credit facility. The largest of the transactions was the acquisition of Active Aero, which was completed August 27, 2014, while the Company's stock price was hovering at $25 per share, and was valued at $115 million in cash.

60.    While these acquisitions enabled Roadrunner to report increasing revenues and earnings per share, acquiring 25 non-public companies between February 2011 and September

2015 bred pervasive internal control problems at Roadrunner. The Company's multi-year acquisition spree left it with an unwieldy organization comprised of disparate operating units. Each company brought with it its own accounting systems and policies and procedures. Once the companies were acquired, Roadrunner's management made virtually no efforts to integrate the newly-acquired companies into a seamless entity and Roadrunner had no process in place to integrate these different accounting processes and/or to incorporate consistent practices across the Company.

61.     During the rapid acquisition period, the Company failed to design and/or execute sufficient internal controls, including controls to address issues in the assimilation and consolidation of information, communications, and other systems of the acquired companies. For instance, the Company's management, finance and IT teams had no comprehensive integration plans, no consistent internal control and accounting procedures and no standardized or common finance or IT systems. The Company did not even have a standard monthly financial reporting package or an automated reporting and consolidation system. Additionally, the Company did not focus on balanced financial metrics such as return on invested capital. The Company also struggled with unfamiliarity with new geographic areas and new assets and the businesses associated with them.

62.     Communication within the Company was virtually non-existent. Management did not communicate relevant information within the Company and at times, made decisions to override internal controls to allow recording accounting entries without appropriate support resulting in the recording of accounting entries that were inconsistent with information known by management at the time. Roadrunner's failure to timely integrate its accounting system with those

of its new acquisitions resulted in numerous accounting inaccuracies and led to very high levels of overhead in proportion to the revenues and an extremely weak internal control environment.

63.     Despite these pervasive integration problems which were well known within the Company, Roadrunner's acquisition binge allowed the Company to manipulate its financial results during the Relevant Period.  Roadrunner used each acquisition as an opportunity to raise its reported earnings through manipulative accounting.  These accounting manipulations included wrongful entries or errors: (i) in the Company's calculation of its cash flow leverage ratio; (ii) relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver, and other receivables, and linehaul and other driver payables; and (iii) related to the accounting for the goodwill assets acquired through the Company's acquisition strategy, among others.

64.     To assure the market that its profits were based on sound strategic decisions, Defendants consistently caused the Company to claim it had adequate internal controls and assure investors that despite the numerous acquisitions in the Relevant Period, all of those acquired businesses were fully integrated into Roadrunner's accounting system and were captured in the Company's financial results.  In conference calls and public statements to investors during the Relevant Period, defendant DiBlasi repeatedly touted the Company's ***"proven ability to smoothly integrate each acquired company."***

65.     While this aggressive growth strategy resulted in a heavy debt load and diminished cash flows, Roadrunner outwardly reported revenues increasing from $632 million in 2010 to nearly $2 billion by 2015, causing a dramatic increase in the market price of Roadrunner common stock as set forth in the following chart:



***The Company's Debt Grows***

66.     During the Relevant Period, the frenzied pace of the acquisitions caused Roadrunner to become burdened with increased debt levels and debt ratios.  For instance, on July 9, 2014, Roadrunner announced in a press release that it had expanded the Company's existing credit facility to $550 million from $368 million through 2019.  Roadrunner's CEO, defendant DiBlasi, stated that "[t]he amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions.'"

67.     Fourteen months later, on September 28, 2015, Roadrunner announced in a press release that the Company had again expanded its existing credit facility to $700 million from $550 million through 2019.   In justifying this amendment, defendant DiBlasi stated that "'[t]he amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions.'"

68.     In fiscal year 2015, Roadrunner's issues with its debt load and the Company's ability to meet the maximum cash flow leverage ratio set by the covenants with the Company's lenders became more apparent.  The covenants with the Company's lenders set strict limits for the ratio of Roadrunner's total funded debt to its earnings before interest, tax, depreciation and amortization

("EBITDA"), referred to as the maximum cash flow leverage ratio. During a November 5, 2015 earnings call about the Company's third fiscal quarter of 2015, defendant Armbruster acknowledged that with net debt load so high, at $449 million, the Company's current cash flow leverage ratio was 3.75, with "about a quarter rooms [sic] on that." This ratio was dangerously close to the limits set by the lenders' covenants.

69.     Roadrunner's issue with its burdensome debt load and decreasing cash flows due to its acquisition strategy continued into 2016. During a February 3, 2016 earnings call discussing the Company's 2015 fourth quarter, defendant Armbruster stated that issues with the Company's cash flow leverage ratio had shifting corporate focus. Armbruster acknowledged during the call that, "[w]hile our focus over the past several years has been on strategic growth and acquisition initiatives to position us for the long term, our focus in 2016 will be on enhancing cash flow from operations and reducing our leverage ratio towards our long-term goal of less than 2.5 times EBITDA."

70.     On May 10, 2016, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016 (the "1Q 2016 Form 10-Q"), where it disclosed that there was "a risk that we may not be in compliance with our financial covenants as of the end of the second quarter."

71.     Less than a month later, on June 2, 2016, the SEC sent a letter to Roadrunner inquiring into the Company's operating metrics, interim goodwill impairment analysis, and compliance with its financial covenants. The SEC letter alerted Board to potential improper conduct or deficiencies with the Company's internal controls. However, the Board did not take any action concerning the problems, and the Company continued to publicly tout its compliance with internal controls for months.

72.    In response to the SEC's letter, Roadrunner's CFO, defendant Armbruster, on behalf of the Company, stated that the Company had met with its primary lending group to amend the credit agreement, including modifications to the specified fixed charge coverage ratio and cash flow leverage ratio for the quarters ended June 30, 2016, September 30, 2016, December 31, 2016, March 31, 2017 and June 30, 2017.

73.    On June 23, 2016, in a Current Report on Form 8-K filed with the SEC, Roadrunner stated that on June 17, 2016, the Company had entered into a consent, waiver and first amendment to its credit agreement, increasing the maximum cash flow leverage ratio.  During a July 27, 2016 earnings call with analysts and investors, the need for a credit agreement amendment became apparent as Roadrunner's years of acquisition-fueled growth had created a crushing debt load. Even with the increased maximum cash flow leverage ratio of 4.5 set by the agreement, defendant Armbruster revealed that the Company's cash flow leverage ratio at the end of the second quarter of 2016 was 4.3.

74.    On November 2, 2016, the Company held an earnings call with analysts and investors.  Without revealing the full extent of the Company's accounting issues, defendant Armbruster stated that the Company's cash flow leverage ratio was approximately 3.99, "which is at the maximum currently allowed by our bank credit facility."

75.    Things came to a head on November 10, 2016, when Roadrunner filed a Notification of Late Filing on Form 12b-25 with the SEC.  This notice explained that the Company would not file its quarterly report for the third fiscal quarter of 2016 on time.  The Company stated there were on-going accounting issues at the Company, including a mistake in the calculation of its cash flow leverage ratio associated with its covenants with lenders for the four fiscal quarters ending September 30, 2016.  Thus, the Company would not be within its financial covenant for

the four fiscal quarters ending September 30, 2016 without a waiver for non-compliance by the Company's lenders. The Company received such a waiver and filed its delinquent quarterly report with the SEC on November 14, 2016. Even still, Defendants thereafter repeatedly assured shareholders that the Company's internal controls over its financial reporting were effective as of September 30, 2016, despite already receiving numerous red flags of misconduct and internal control failures.

76. Revealing a significant accounting error that prevented filing its Form 10-Q for the third quarter ended September 30, 2016, the Company had identified mistakes in its calculation of its cash flow leverage ratio for an entire fiscal year. The Form 12b-25 stated:

## PART III
## NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

*Roadrunner Transportation Systems, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q")* within the prescribed time period without unreasonable effort or expense for the reasons described below.

On November 4, 2016, during the preparation and review of the Company's quarterly compliance certificate required under its credit agreement, *the Company identified a mistake in the calculation of its cash flow leverage ratio for the four quarters ended September 30, 2016. Based on the corrected calculation*, upon the delivery of the quarterly compliance certificate (required to be delivered by November 14, 2016), *the Company would not be in compliance with its cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016 absent a waiver of such anticipated non-compliance by the required lenders under the credit agreement*. Since discovering the mistake, the Company has been in ongoing discussions with U.S. Bank National Association ("U.S. Bank") and the other lenders under its credit agreement with respect to a waiver of the Company's anticipated non-compliance with, and any actual or potential event of default resulting from such anticipated non-compliance with, the cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016. As a result of those ongoing discussions and other

related matters that have required the attention of senior management and other key personnel, the Company could not, without unreasonable effort and expense, complete its financial statements for the three and nine months ended September 30, 2016 and related disclosures and, consequently, could not file its Q3 2016 Form 10-Q within the prescribed time period. The Company currently intends to file the Q3 2016 Form 10-Q within 5 calendar days of its prescribed due date.

### *Roadrunner Admits to "Accounting Discrepancies" and the Need to Restate Financial Results*

77. Only a month and a half later, on January 30, 2017, the Company was forced to come clean and admit its lack of internal controls over its financial reporting. After the markets closed that day, Roadrunner announced that the Company was required to restate all of its quarterly reports on Form 10-Q for the fiscal quarters ended March 31, 2014 through September 30, 2016 and annual reports on Form 10-K for the fiscal years ended December 31, 2014 and 2015. The Company stated that shareholders and investors could no longer rely upon any of the enumerated financial statements as well as the associated reports of Roadrunner's accountants at Deloitte & Touche LLP. Finally acknowledging that it lacked internal controls during its acquisition spree, the Company announced that the restatement was necessary because it had discovered "accounting discrepancies" at two of its operating subsidiaries, Morgan Southern and Bruenger, acquired by the Company in 2011.

78. Specifically, Roadrunner acknowledged that errors had been made in the accounting of "unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and linehaul and other driver payables." The Company also admitted that an investigation had been commenced and could reveal that there were accounting errors within periods prior to those mentioned.

79. In the January 30, 2017 press release entitled "Roadrunner Transportation Systems Announces Restatement of Prior Period Financial Statements," attached to a Current Report on Form 8-K filed with the SEC, the Company announced that the accounting errors at Roadrunner

would require an estimated $20 million to $25 million adjustment on operating income overall.

Roadrunner also disclosed that additional material accounting adjustments could be found during

the Company's investigation.  The press release stated:

> Roadrunner Transportation Systems, Inc. ("Roadrunner"), a leading asset-light transportation and logistics service provider, announced today that on January 27, 2017 its Audit Committee, after considering the recommendation of management, concluded that, as a result of the information obtained to date in connection with an ongoing investigation described below, the following financial statements and associated reports of Roadrunner's independent registered public accounting firm, Deloitte & Touche LLP, previously filed with the Securities and Exchange Commission ("SEC") should no longer be relied upon:
>
> - the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2014;
>
> - the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014, June 30, 2014, and September 30, 2014;
>
> - the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015;
>
> - the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, and September 30, 2015; and
>
> - the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016, June 30, 2016 and September 30, 2016.
>
> Similarly, related press releases, investor presentations or other communications describing Roadrunner's financial statements for these periods should no longer be relied upon.
>
> In November 2016, Roadrunner was made aware of various potential accounting discrepancies at its Morgan Southern and Bruenger operating subsidiaries.  In response, Roadrunner's Board of Directors immediately commenced an investigation of the discrepancies with the assistance of Greenberg Traurig, LLP, as outside counsel, and RubinBrown LLP, as forensic accountants.  ***The investigation into these discrepancies is still ongoing***; however, ***based on the investigation to date, Roadrunner has identified various accounting errors that it***

*currently estimates will require prior period adjustments to Roadrunner's results of operations of between $20 million and $25 million.*

These errors principally relate to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables. As the investigation is ongoing, the estimated amount is preliminary and could change materially. The investigation to date has disclosed that the accounting discrepancies may also affect periods prior to the periods set forth above. Roadrunner has not yet completed its analysis, however, to determine which prior periods may be affected. In addition, Roadrunner has begun to undertake a significant effort to determine if similar discrepancies and internal control deficiencies impacted other operating entities that were not part of the investigation. Therefore, *there may be additional accounting adjustments as a result of these efforts and such adjustments may be material.*

In addition, in conjunction with the investigation, Roadrunner is reassessing its internal controls over financial reporting and its compliance programs. *The result of this reassessment could lead Roadrunner to conclude that there were deficiencies in Roadrunner's internal controls over financial reporting that constitute material weaknesses* and would therefore effect the conclusions regarding effectiveness previously expressed in Item 9A, Controls and Procedures, of Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015.

80. Further, in the Form 8-K section entitled "Material Impairments," the Company revealed that it would record a non-cash goodwill impairment charge in the range of $175 million to $200 million, further demonstrating the damage done to the Company's reputation.

81. On this news, Roadrunner's stock price plunged more than 31%, or $3.62 per share, on January 31, 2017, to close at $7.92 per share compared to the previous trading day's closing of $11.54 per share, erasing almost $138.8 million of shareholder equity in a single day. The price of Roadrunner stock has yet to recover, remaining below $2.74 per share as of the filing of this complaint.

82. In a conference call held on January 31, 2017 for investors and analysts, defendant Stoelting, the Company's CEO, admitted that *"high levels of growth had put some stress and stretched the organizational structure that was in place."* Moreover, Stoelting highlighted the Company's lack of effective internal accounting controls and disclosure procedures when he

admitted that the Company would have benefited from "more oversight from a corporate point of view."

83. In the wake of these adjustments, analyst David Ross at Stifel Nicolaus suspended his rating on Roadrunner in light of the fact that the Company "appear[s] to have significantly overstated prior period earnings" and that there was now a "strong negative bias" on the shares, as the future of the Company was "likely selling off pieces to pay back its lenders."

84. In response to these events, the Company initiated the Internal Investigation conducted by the Company's Audit Committee and assisted by Greenberg Traurig, LLP as outside counsel and RubinBrown LLP, as forensic accountants. As counsel to the Company, Greenberg Traurig has submitted opinion letters to the SEC on behalf of Roadrunner and has assisted in the preparation of the Company's regulatory filings with the SEC as far back as 2011. Greenberg Traurig's dual role as counsel to the Company and advisor to the Audit Committee during the Internal Investigation presents a substantial conflict of interest, and Greenberg Trauig had material conflicts as it has represented the alleged wrongdoers in proceedings related to the very subject matter that the law firm was asked to neutrally investigate, which is incompatible with a board's fiduciary duty to inform itself of all material information reasonably available prior to making a business decision. Roadrunner's Board was fully aware of this conflict of interest, but allowed Greenberg Traurig to remain as a legal counsel to the Audit Committee.

85. Roadrunner's restatement is an admission that the Company's originally-issued financial statements from 2011 through the third quarter of 2016 contained material errors at the time they were issued. Further, by definition the restatement resulted from errors relating to facts existing at the time. GAAP requires a restatement to occur when the originally issued financial statements were based on materially misleading and/or incorrect financial and accounting

practices. As set forth in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 250, Accounting Changes and Error Corrections, the type of misstatements by Roadrunner are for a ***"correction of an error in previously issued financial statements."*** ASC 250-10-5-4 defines an error in previously issued financial statements as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared."

***The Results of the Investigation and the Restatement***

86.     On January 31, 2018, Roadrunner announced that it had completed the Internal Investigation and the restatement of previously reported financial results. As a result, the Company filed its amended Annual Report on Form 10-K/A for the year ended December 31, 2015, its amended Quarterly Reports on Form 10-Q/A for the quarterly periods ended March 31, 2016, June 30, 2016 and September 30, 2016, and its Annual Report on Form 10-K for the year ended December 31, 2016. The Company announced that it had overstated earnings by $15.2 million from 2011 through 2013, $19.3 million in 2014, $22.4 million in 2015 and $9.6 million in the first three quarters of 2016, totaling ***$66.5 million***. The press release stated:

> Roadrunner Transportation Systems, Inc. ("Roadrunner" or the "company") (NYSE: RRTS), a leading asset-right transportation and asset-light logistics service provider, announced today it has completed its restatement of previously reported financial results. As a result, the company filed its amended Annual Report on Form 10-K/A for the year ended December 31, 2015, and its amended Quarterly Reports on Form 10-Q/A for the quarterly periods ended March 31, 2016, June 30, 2016 and September 30, 2016. The company also concurrently filed its Annual Report on Form 10-K for the year ended December 31, 2016.
>
> Restatement Summary
>
> The restatement is the result of an internal investigation undertaken by the Audit Committee of Roadrunner's Board of Directors (the "internal investigation") into

certain accounting discrepancies announced on January 30, 2017. The internal investigation found that the company overstated its net income by approximately $66.5 million from 2011 through the third quarter of 2016. The internal investigation initially focused on two operating entities and the 2014 through 2016 reporting periods. However, during the course of the internal investigation, the scope expanded to include the 2011 through 2016 reporting periods, other operating companies and corporate headquarters. ***The internal investigation identified accounting errors that substantially impacted all financial statement line items and disclosures, and identified material weaknesses in the company's internal control over financial reporting.***

87.     In the same press release, the Company disclosed the ongoing SEC and DOJ investigations into the events giving rise to the restatement.

88.     The investigation found that the Company overstated its net income by approximately ***$66.5 million*** from 2011 through the third quarter of 2016.  While the Internal Investigation initially focused on two operating entities and the 2014 through 2016 reporting periods, the scope was expanded to include the 2011 through 2016 reporting periods, other operating companies and corporate headquarters. The Internal Investigation identified accounting errors that substantially impacted all financial statement line items and disclosures, and identified material weaknesses in the Company's internal control over financial reporting.

89.     The Internal Investigation also found that the Company's management made key accounting errors and uncovered weaknesses in the internal controls on financial reporting.  In the Company's 10K-A filed on January 31, 2018, the Company disclosed that:

> Current management determined that structural and environmental factors, including the increased size and complexity arising from the acquisition of 25 non-public companies between February 2011 and September 2015, the inconsistency of our accounting systems, policies and procedures, and management override of internal controls contributed to the material weaknesses and resulting material accounting errors. ***Our internal controls failed to prevent or were overridden by management in certain instances to allow recording accounting entries without appropriate support, recording accounting entries that were inconsistent with information known by management at the time, not communicating relevant information within our organization and, in some cases, withholding***

*information from our independent directors, our Audit Committee, and our independent auditors, which resulted in material accounting errors.*

\*\*\*

*We did not maintain an effective control environment to enable the identification and mitigation of risks of material accounting errors based on the contributing factors to material weakness in the control environment, including:*

*The tone from former executive management was insufficient to create the proper environment for effective internal control over financial reporting and to ensure that (i) there were adequate processes for oversight, (ii) there was accountability for the performance of internal control over financial reporting responsibilities, (iii) identified issues and concerns were raised to appropriate levels within our organization, (iv) corrective activities were appropriately applied, prioritized, and implemented in a timely manner, and (v) relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditors.*

In certain operating companies and at our corporate headquarters there were inconsistent accounting systems, policies, and procedures. Additionally, in certain locations we did not attract, develop, and retain competent management, accounting, financial reporting, internal audit, and information systems personnel or resources to ensure that internal control responsibilities were performed and that information systems were aligned with internal control objectives.

Our oversight processes and procedures that guide individuals in applying internal control over financial reporting were not adequate in preventing or detecting material accounting errors, or omissions due to inadequate information and, in certain instances, management override of internal controls, including recording improper accounting entries, recording accounting entries that were inconsistent with information known by management at the time, not communicating relevant information within our organization and, in some cases, withholding information from our independent directors, our Audit Committee, and our independent auditors.

90.     In a conference call on January 31, 2018 with investment analysts, Roadrunner's

CEO, defendant Stoelting, admitted to a pattern of poor business practices during the Company's

buying frenzy, acknowledging that "both Roadrunner's accounting practices and business practices were not adequate" and that "[o]ne of the main causes of the restatement was that Roadrunner completed over 25 acquisitions of nonpublic companies without some very basic tools." Stoelting noted that:

> [M]anagement, finance and IT teams had no comprehensive integration plans, no consistent internal control and accounting procedures and no standardized or common finance or IT systems. As simple examples, Roadrunner, with over 25 subsidiaries, did not have a standard monthly financial reporting package or an automated reporting and consolidation system. Additionally, prior management did not focus on balanced financial metrics such as return on invested capital.

> The large number of acquisitions increased the complexity of the company, and they also increased the company's debt levels and leverage ratios. Ultimately, the large number of acquisitions exposed weaknesses in the company's corporate finance team, systems and internal control environment.

91. During the same conference call, the Company's CFO, Terence R. Rogers, admitted that with regard to the Company's integration strategy, "'[e]ach [acquired] company brought with it its own accounting system and policies and procedures. No process was put into place to integrate these different accounting processes or to incorporate consistent practices across the company."

92. Rather than fire these individuals who actively participated in the harm caused to the Company, Roadrunner allowed several of the participants in this wrongdoing to remain on the Board, including the Company's former CEO, defendant DiBlasi, the architect of the Company's aggressive acquisition strategy, who is the current Vice Chairman of the Board, and remains as an employee and executive officer of the Company.

93. Further, in breach of their fiduciary duties, the Company has even agreed to pay large severance agreements to wrongdoers. The Company has disclosed that former CEO, defendant DiBlasi, and CFO Armbruster, who left the Company in March 2017, among others

"were, eligible to receive cash severance payments in certain circumstances related to involuntary terminations of employment."  In addition, the Company terminated defendant van Helden, the Company's former Chief Operating Officer, whom Defendants had touted as being "instrumental in the integration" of the Company's acquisitions.[3]  On June 10, 2015, the Company entered into a severance agreement with van Helden, providing for 86,468 Roadrunner shares of pursuant to a stock option agreement as well as his base salary for a year.  Defendant van Helden was Roadrunner's second-highest-paid executive in 2014, with total compensation of $756,000.

94.     On June 12, 2017, the Company filed a Current Report on Form 8-K with the SEC announcing that on May 18, 2017, the Board had increased its size from ten to twelve members. The Form 8-K also advised that on June 6, 2017, the Board appointed Dobak and Kittle to the Board without a stockholder vote.  Defendant Dobak is the current CEO of Dicom, a competing transportation service corporation.

***The Duration of the Improper Accounting and the Magnitude of the Restatement***

95.     The restatement does not hinge on an honest accounting mistake or a mere oversight during a single quarter or even a single year or two that were later corrected in good faith. Roadrunner admitted that its public financial statement reports for the years ended 2011, 2012, 2013, 2014, 2015 (including quarterly reports) and through the third quarter of 2016 were false. This was done to correct Roadrunner's accounting improprieties that could no longer be concealed.

96.     A study of restatements by publicly traded companies indicates that the average number of days covered by restatement was 510 in 2008, 496 in 2009 and 491 in 2010, according to a May 2011 report prepared by Audit Analytics, titled "2010 Financial Restatements: A Ten Year Comparison." Here, in contrast, Roadrunner's restatements covered a period of approximately

---

[3] *See* Transcript of Q2 2011 Roadrunner Earnings Conference Call, August 3, 2011.

*five years*, totaling at least *1,825 days*. The extended duration of the internal control deficiencies over a period of approximately five years demonstrates a knowing or reckless disregard for the Company's financial reporting obligations.

97.     The restatement was strikingly large and material. Overall, Roadrunner cumulatively overstated its net income by approximately *$66.5 million* from 2011 through the third quarter of 2016.

98.     Additionally, the extended time period and the effort required to issue Roadrunner also demonstrates that the restatement was not the product of mere negligence. According to the Audit Analytics report, the average time a company required to issue a restatement following the initial disclosure was 16.80 days in 2008, 19.28 days in 2009 and 4.95 days in 2010. Here, Roadrunner has admitted that the Company's management became aware of a mistake in the calculation of its cash flow leverage ratio on November 4, 2016. The Company subsequently publicly disclosed the existence of the "accounting discrepancies" on January 30, 2017. The Internal Investigation and restatement results were announced a year later, on January 31, 2018. Thus, Roadrunner needed *422* days to finalize and issue its restatement after the issue was first publicly disclosed.

99.     On a January 31, 2018 investor conference call, defendant Stoeling admitted that resolving the lack of controls and conducting the Internal Investigation presented a "difficult" task that required "much work by outside accountants, auditors, attorneys and our new finance team", demonstrating the depth and magnitude of Roadrunner's improper financial practices. Due to the "resource commitment required to complete the restatement", the Company announced that it was behind schedule on completing its 2017 financial statements, subjecting it to a risk of being de-listed by the NYSE.

100.     Roadrunner's difficulty in addressing its material control deficiencies and the extended time period required to do so demonstrates the significant ineffectiveness of the prior controls.

**The Audit Committee Abdicated its Responsibilities**

101.     Roadrunner had several layers of oversight and internal controls that, had they been effectively designed and had they worked properly, should have, at a minimum, detected the fraud at an earlier point.  In addition to certain basic internal controls, the Company had an Audit Committee charged with the responsibility of overseeing the Company's accounting practices and protecting the interests of the Company and its shareholders.  During most of the Relevant Period, the Audit Committee was made up of defendants Kennedy, Murray, Urkiel and Utrup.

102.     The SEC has stated that "[a]udit committees play a ***critical role*** in the financial reporting system by overseeing and monitoring management's and the independent auditor's participation in the financial reporting process.  Audit committees can, and should, be the corporate participant best able to perform that oversight function."  *See* Audit Committee Disclosure, Exchange Act Release No. 34-42266, 71 SEC Docket 787, 1999 WL 1244029, at *3 (Dec. 22, 1999) (emphasis added).

103.     The Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees, which was sponsored by the New York Stock Exchange and the NASD, specifically stated that an audit committee's oversight function includes the responsibility for ensuring that the corporation has internal controls in place specifically to ***deter management fraud***. As the report issued by that Committee provides:

> [S]uch oversight includes ensuring that quality accounting policies, internal controls, and independent and objective auditors are in place to deter fraud, anticipate financial risks and promote accurate, high quality and timely disclosure of financial and other material

information to the board, to the public markets, and to shareholders.

104.   Roadrunner's SEC filings represented that the members of the Audit Committee performed the following functions, among others: review of periodic financial statements; communication with independent accountants; review of the Company's internal accounting controls; and recommendation to the Board as to the selection of independent accountants.

105.   The Audit Committee had the greatest ability to oversee the financial statements of the Company and the effective use of its internal controls. Notwithstanding its statutory and self-imposed obligations, the Audit Committee functioned in a way that made it highly unlikely that red flags would come to its attention. As the Internal Investigation conducted by the Audit Committee reveals, the Audit Committee was distant and detached from the workings of the Company.  According to the Internal Investigation, management aided the Audit Committee's lack of awareness and oversight failures by "presenting the Board with very limited information about the Company" and at times, even concealing information from the Board and the Audit Committee, as well as the Company's auditors. These failures were the result of the Audit Committee's oversight and lack of participation, and their failure to establish an effective reporting structure with management.  The Audit Committee was reckless by failing to become sufficiently familiar and involved with the Company's internal financial workings, which precluded it from identifying weaknesses in the Company's internal control structure.  Given that the Company's business model was based on growth through acquisition, had the Audit Committee exercised appropriate oversight, it knew or should have known that the Company had inadequate internal controls and integration strategies.   The Audit Committee's lack of active participation and oversight and their failure to establish a reporting structure with management is apparent given the pervasive nature of the accounting scheme at the Company that lasted from 2011 through the end of 2016.

106.    In order to function effectively, it was vital for the Audit Committee to have a detailed understanding of the Company, particularly its financial systems and internal controls, and the integration of the numerous acquisitions.   To fulfill its responsibilities, the Audit Committee should have ensured that proper internal controls were established, should have been familiar with the Company's integration strategies and policies (or lack thereof), and should have been informed of critical accounting choices for any kind of transaction or judgment decisions. The Audit Committee should have met regularly and as needed with the Company's CFO, comptroller, internal auditor, and other personnel responsible for the Company's financial reporting process and internal controls, as well as with the outside auditor.  As indicated by the Internal Investigation, the Audit Committee failed on every level in its oversight duties and failed to obtain the necessary information about the Company's internal control failures and integration issues.

107.    Roadrunner had expanded quickly, through a series of acquisitions, each of which raised concern about Roadrunner's accounting and internal controls.  As the Audit Committee members should have recognized, these acquisitions were not integrated, posing serious challenges for the Company and the Audit Committee.  The failure of the Audit Committee to establish a true reporting relationship with Company management – as Company policy required – was clearly a factor in the failure to recognize the rampant, years-long fraud at Roadrunner.

108.    In the face of mounting debt and decreasing cash flows, the Audit Committee defendants—expressly charged with oversight of Roadrunner's internal controls and the accuracy of its financial statements—willfully ignored the Company's obvious and pervasive lack of controls and made no good faith effort to correct or prevent the disaster that would ensue as a result, in violation of their responsibilities under the Company's Charter.

109.     The Internal Investigation's self-serving, self-exonerating findings of the Audit Committee (assisted by its conflicted law firm, Greenberg Trauig) that management was "not communicating relevant information within our organization and, in some cases, withholding information from our independent directors, our Audit Committee, and our independent auditors, which resulted in material accounting errors" attempts to absolve the Audit Committee of its express duties to ensure the integrity of the firm's accounting and financial reporting systems, including that appropriate controls and systems are in place for integration of the various acquisitions during the Relevant Period. Indeed, allowing the Audit Committee to investigate itself, assisted by conflicted counsel Greenberg Trauig, who had previously prepared SEC filings and acted as counsel for the Company, presents a "fox guarding the hen house" situation.

110.     The Audit Committee abdicated its responsibilities by (i) failing to establish a strong reporting mechanism between itself and Company management and/or the finance department;
(ii) failing to supervise or exercise any responsibility for the Company's integration procedures;
(iii) failing to ensure that the Company's management and finance department conducted investigations of the Company's financial statements.

***Defendants' False and Misleading Statements***

111.     During the Relevant Period, Defendants issued materially false or misleading statements and omissions concerning the Company's financial performance. Moreover, in addition to the materially false or misleading misstatements and omissions related to its financial performance, Defendants knowingly or recklessly made materially false or misleading statements and omissions regarding the purported adequacy of the Company's internal controls and the failed integration of acquired companies.

112.    Specifically, the statements described below in ¶¶113-177 were each improper when made because they failed to disclose and misrepresented the following material adverse facts, which defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company lacked effective internal control over its financial reporting;

(b)    the Company's financial statements overstated the estimated results of operations;

(c)    the Company failed to properly implement an integration plan for the acquired companies and the acquisitions were never properly integrated;

(d)    the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and linehaul and other driver payables;

(e)    the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy;

(f)    the Company's subsidiaries were engaged in illegal improper accounting practices;

(g)    the Company failed to timely and adequately take steps to remediate the material weaknesses in its internal controls; and

(h)    as a result of the foregoing, the officers' and directors' representations concerning the Company's internal control of its financial reporting were improper.

113.    Defendants' improper statements regarding Roadrunner's financial performance began on May 4, 2011, when Defendants caused the Company to issue a press release announcing its financial results for the first quarter ended March 31, 2011 ("Q1 2011"). The Company reported

that it generated revenue growth of approximately 20%, and, net revenue growth of approximately 27%.

114.     On May 13, 2011, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2011 (the "1Q 2011 Form 10-Q").  Repeating the financial statements in the press release, Defendants, in the section entitled "Controls and Procedures," asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

115.     On August 3, 2011, Defendants caused the Company to issue a press release announcing its financial results for the second quarter ended June 30, 2011 ("Q2 2011").  The Company reported that "[r]evenues increased 30.4% and net revenues expanded 46.8% from the prior year, resulting primarily from new customer growth, pricing initiatives, fuel increases, and the inclusion of our February 2011 acquisition of Morgan Southern."

116.     On August 2, 2011, during the Q2 2011 earnings conference call, Defendants touted their second quarter net revenues and defendant DiBlasi represented that the ***integration of both Morgan Southern and Bruenger has gone very well*** and that that their acquisition strategy involved "look[ing] at how smoothly we will be able to integrate those companies into the [sic] Roadrunner."

117.     On August 12, 2011, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q2 2011.  Repeating the financial statements in the press release, Defendants, in the section entitled "Controls and Procedures," asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

118. On November 2, 2011, Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended September 30, 2011 ("Q3 2011"). The Company reported that revenues increased 38.2% and net revenues expanded 73.1% from the prior year, resulting primarily from new customer growth, pricing initiatives, fuel increases, and the inclusion of the acquisitions of Morgan Southern and Prime. The Company's operating income growth of 61.4% outpaced revenue growth despite the effects of higher fuel prices on revenues and operating costs. In the press release, defendant DiBlasi stated that "[r]ecord third quarter revenue and operating income was achieved in all three operating segments."

119. On November 2, 2011, during the Q3 2011 earnings conference call, defendant DiBlasi stated that "our acquisitions of Bruenger, Morgan Southern, our intermodal service business, and our August 31 acquisition of Prime, our freight consolidation and inventory management business, contributed to over $33 million of the revenue increase." Discussing the Company's acquisition strategy, DiBlasi stated that:

> [W]e will only seek customers with management teams that will stay after the acquisition, and fit in well with us culturally, and be immediately accretive once the acquisition takes place. ***We've been successful in doing that with all of our most recent acquisitions over the course of the last year.***

120. On November 14, 2011, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q3 2011. Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

121. On February 8, 2012, Defendants caused the Company to issue a press release announcing its record financial results for the fourth quarter ended December 31, 2011 ("Q4 2011"), which the Defendants touted as ***"the best quarter in the history of the company."*** The

Company reported that revenues increased 43.6% and net revenues expanded **97.1%** from the prior year, resulting primarily from new customer growth, pricing initiatives, fuel increases, and the inclusion of the acquisitions of Morgan Southern and Prime Logistics.  The operating income growth of 99.1% outpaced revenue growth.

122.    On February 8, 2012, during the Q4 2011 earnings conference call, defendant DiBlasi re-assured analysts that "[t]he integration of [Prime] went very smoothly" and "we are seeing results from the cross-selling opportunities with that company."  DiBlasi also stated:

> The fourth quarter was a very good quarter for us. It was the third quarter overall where we broke records, or set records. We see ourselves as a very strong growth company. You've heard us talk about acquisitions and organic growth, we expect to continue that. We expect the first quarter to be pretty significant as well based on the guidance we've given you, and *we are very pleased with how we performed in the fourth quarter, very pleased with what we are seeing now in the company, in the integration of companies that we acquired.*

123.    On March 15, 2012, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q4 2011.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

124.    On May 2, 2012, Defendants caused the Company to issue a press release announcing its record financial results for the first quarter ended March 31, 2012 ("Q1 2012"). The Company reported first quarter revenue growth of 38.2% and net revenue growth of 70.5%, and operating income growth of 93.2% outpaced revenue growth despite the effects of higher fuel prices on revenues and operating costs.   In the press release, DiBlasi stated that "[*o*]*perating income for the first quarter of 2012 represented the best quarter in the history of the company*" and the Company's operating ratio improved 180 basis points to 93.8% from 95.6%.

125.    On May 2, 2012, during the Q1 2012 earnings conference call, defendant DiBlasi stated that:

> *[A] big key to our acquisition strategy [is] our ability to integrate companies quickly*. We put a lot of emphasis on the cultural fit between our company and the management team of the company we're acquiring. We've been able to acquire companies where there is a very strong cultural fit and, because of that, I think it makes the integration much smoother and that's why we've been so successful. We've made six acquisitions in the last calendar year or about the last 15 months. *They've all gone very well. They've all integrated very well.* And they've all complemented and we've been able to hit the ground running in terms of cross-selling the services -- the new services we've added as well as the complementing services that we've added as well.

> So we're very pleased with how our previous acquisitions have gone.  As I mentioned a few moments ago, we have a very robust pipeline of potential acquisitions out there. *We have been very successful with the previous acquisitions and we expect to be just as successful with the future acquisitions that we have in the works right now.*

126.    On May 10, 2012, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q1 2012.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

127.    On August 1, 2012, Defendants caused the Company to issue a press release announcing its record financial results for the second quarter ended June 30, 2012 ("Q2 2012"). For the quarter, Defendants claimed that "[s]trong performance across all of our business segments generated second quarter revenue growth of 26.1% and net revenue growth of 47.8%.  The Company reported that "[o]perating income for the second quarter of 2012 represented the best quarter in the history of the company.  Our operating ratio improved 110 basis points to 92.9% from 94.0% in the second quarter of 2011 and 90 basis points sequentially from the first quarter of 2012."

128.     On August 1, 2012, during the Q2 2012 earnings conference call, defendant DiBlasi touted the Company's ***"proven ability to smoothly integrate each acquired company"***, which was a "large factor[] as to why our pipeline is at such a high level."  DiBlasi further stated:

> ***The integration of D&E Transport and CTW Transport, the acquisitions that we announced in April and June are going well*** and we expect to see additional growth opportunities from our cross selling initiatives with those companies.
>
> ***
>
> ***I can tell you that we've been very successful with the acquisitions we've made over the course of the last few years***, in particular over the last year and half because we put a lot of emphasis on that cultural fit. And if you have a strong cultural fit you're integration of an acquired company goes very smoothly. If you don't have a cultural fit you have a lot of pushback and a lot of issues that crop up after the sale that you have to work through. ***We've rarely experienced that because of the diligence we put in on the front side when we make an acquisition***. And that will continue to be our profile going forward.

129.     On August 9, 2012, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q2 2012.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

130.     On October 31, 2012, Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended September 30, 2012 ("Q3 2012").  The Company reported "[s]trong performance across all of our business segments generated third quarter revenue growth of 23.4% and net revenue growth of 37.0%.  Due to sales and operational initiatives, our operating income growth of 40.7% outpaced revenue."

131.     On October 31, 2012, during the Q3 2012 earnings conference call, defendant DiBlasi touted that the ***"integration of R&M and Sortino, our acquisitions that we announced in August, are going well…"***

132.    On November 8, 2012, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q3 2012.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

133.    On February 6, 2013, defendants caused the Company to issue a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2013 ("Q4 2012").  The Company reported that Q4 2012 net income available to common stockholders increased 38.8% over the prior year quarter to $9.5 million.  In the press release, defendant DiBlasi stated that "[s]trong performance across all of our business segments generated fourth quarter revenue of 24.0% and net revenue growth of 29.5%.  Due to sales and operational initiatives, our operating income growth of 33.6% outpaced revenue."

134.    On February 6, 2013, during the Q4 2012 earnings conference call, defendant DiBlasi stated that **"the integration of our fourth quarter acquisitions of Central Cal, A&A and DCT is going well** and we are seeing additional growth opportunities from our cross-selling initiatives."

135.    On March 14, 2013, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q4 2012.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

136.    On May 1, 2013, Defendants caused the Company to issue a press release announcing its financial results for the first quarter ended March 31, 2013 ("Q1 2013").  In the

press release, defendant DiBlasi claimed that the Company **_"achieved record revenues and_** **_operating income in the first quarter of 2013_**. [ ]  Strong performance across all of our business segments generated first quarter revenue growth of 26.5% and net revenue growth of 33.8%.  Due to sales and operational initiatives, our operating income growth of 30.7% outpaced revenue."

137.    On May 10, 2013, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q1 2013.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

138.    On May 20, 2013, during the Q1 2012 earnings conference call, defendant DiBlasi stated that **_"the integration of our fourth quarter acquisitions [] went well_** and we are seeing additional growth opportunities from multiple cross-selling initiatives throughout the Company."

139.    On July 31, 2013, Defendants caused Roadrunner to announce in a press release its financial results for the second quarter ended June 30, 2013 ("Q2 2013").  The press release boasted of a strong performance across all business segments, with revenue growth of 26.4% and net revenue growth of 35.6%.  Due to alleged sales and operational initiatives, the Company asserted operating income growth of 31.4%, which outpaced revenue.  The Company also claimed an operating ratio at 92.6%, improving 30 basis points, compared to 92.9% in the second quarter of 2012.

140.    On August 1, 2013, during the Q2 2013 earnings conference call, defendant DiBlasi stated that "[i]n August of 2012, we acquired Expedited Freight Systems. … Since that time, we have integrated EFS into our LTL services and have seen nice growth in that service offering."  DiBlasi continued:

[T]he teams that we've been able to strategically assemble in each of our business units are highly motivated to efficiently grow Roadrunner business and have the proven capability to do so. ***This strength in management team also enhances the smooth integration of our many acquisitions***.

*** * ***

Our differentiated strategy and our strong reputation in the transportation community as well as ***our proven ability to smoothly integrate each acquired company*** are large factors as to why our pipeline is at such a high level.

141.    On August 9, 2013, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q2 2013.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

142.    On October 30, 2013, Defendants caused Roadrunner to announce in a press release its financial results for the third quarter ended September 30, 2013 ("Q3 2013"). The Company reported revenue growth, with operating income growth outpacing revenue growth, which it attributed to acquisitions.  The press release quoted defendant DiBlasi as stating "[t]he combination of strong organic and acquisition-related revenue growth led to a 30.1% increase in third quarter revenues and a 32.3% increase in net revenues over the third quarter of 2012.  For the 2013 third quarter, our operating income growth of 31.4% continued to outpace our revenue growth."  DiBlasi noted that "the positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 48.1% increase in our TL operating income quarter-over-quarter."

143.    On November 8, 2013, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q3 2013.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective

and that there was no change in its internal controls that had materially affected its financial reporting.

144.    On November 12, 2013, during the Q3 2012 earnings conference call, Defendant DiBlasi stated "we closed Marisol, our first significant international acquisition, during the third quarter and ***the integration is going very well***…. The integration of our April 2013 acquisition of Wando Trucking went very well.  In addition, we acquired three additional smaller companies in the third quarter, which have been ***fully integrated*** into our truckload segment."

145.    In a February 5, 2014 press release, Roadrunner reported financial results for the fourth quarter and fiscal year ended December 31, 2013.  The Company attributed its increased growth to its acquisition strategy, and defendant DiBlasi stated "strong organic and acquisition-related revenue growth led to a 24.4% increase in 2013 fourth quarter revenues and a 21.6% increase in 2013 fourth quarter net revenues over the fourth quarter of 2012."

146.    On February 18, 2014, during the Q4 2013 earnings conference call, defendant DiBlasi stated ***"our proven ability to smoothly integrate each acquired company***, are large factors as to why our pipeline is at such a high level."

147.    On March 13, 2014, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for Q4 2013.  Repeating the financial statements in the press release, Defendants asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting.

148.    On May 8, 2014, Defendants caused Roadrunner to with the SEC file its Quarterly Report on Form 10-Q announcing the Company's financial and operating results for the first quarter ended March 31, 2014.  For the quarter, Defendants claimed that the Company had net

income of $10.4 million, or $0.27 per diluted share, on revenue of $382 million, compared to net income of $10.6 million, or $0.29 per diluted share, on revenue of $299.3 million for the same period in the prior year. Defendants also reported a $22.7 million increase in accounts receivable and a $2.2 million decrease in accounts payable.

149.     On May 14, 2014, during the Q1 2013 earnings conference call, defendant DiBlasi stated that *"our proven ability to smoothly integrate each acquired company are large factors as to why our pipeline is at such a high level*."

150.     On August 7, 2014, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2014 ("Q2 2014"). Without revealing on-going issues with the Company's internal controls over its financial reporting, Defendants claimed that net income was $14.8 million, or $0.38 per diluted share, on revenue of $460.2 million, compared to net income of approximately $14 million, or $0.37 per diluted share, on revenue of $331.9 million for the same period in the prior year. Defendants also reported a $36.8 million increase in accounts receivable and a $0.9 million increase in accounts payable.

151.     On August 21, 2014, during the Q2 2014 earnings conference call, defendant DiBlasi stated that *"our proven ability to smoothly integrate each acquired company are large factors as to why our pipeline remains at such a high level."*

152.     On October 30, 2014, during the third quarter ended September 30, 2014 ("Q3 2014") earnings conference call, defendant DiBlasi stated that *"our proven ability to smoothly integrate each acquired company are large factors as to why our pipeline is at such a high level."*

153.     On November 6, 2014, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for Q3 2014. For the quarter, Defendants reported that net income was $14.4 million, or $0.37 per diluted share, on revenue of $498.1 million, compared to net

income of $13.2 million, or $0.35 per diluted share, on revenue of $363.2 million for the same period in the prior year. Defendants also reported a $55.3 million increase in accounts receivable and a $19.4 million increase in accounts payable.

154. On February 5, 2015, during the fourth quarter 2014 ("Q4 2014") earnings conference call, defendant DiBlasi stated *"our proven ability to smoothly integrate each acquired company are large factors as to why our pipeline continues to be at such a high level."*

155. On March 2, 2015, Defendants caused Roadrunner to file with the SEC its Annual Report on Form 10-K announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2014 (the "2014 Form 10-K"). For the quarter, Defendants reported net income of $12.3 million, or $0.32 per diluted share, on revenue of $532.5 million, compared to net income of $11.2 million, or $0.29 per diluted share, on revenue of approximately $367 million for the same period in the prior year. Additionally, for 2014, Defendants reported net income of $52 million, or $1.32 per diluted share, on revenue of $1.9 billion, compared to net income of $49 million, or $1.29 per diluted share, on revenue of $1.3 billion for 2013. Defendants also alleged that there was a $44.5 million increase in accounts receivable and a $10.9 million increase in accounts payable for 2014. In the section entitled "Controls and Procedures – Management's Report on Internal Control Over Financial Reporting," Defendants declared that management is "responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendants, despite this responsibility, claimed that there was no material change in the Company's internal controls over financial reporting. Defendants

DiBlasi, Armbruster, Rued, Doerr, Kennedy, Staley, Urkiel, Utrup and Vijums signed the Form 10-K, including statements concerning the adequacy of the Company's internal controls over its financial reporting.

156.    On May 7, 2015, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2015.  For the quarter, despite on-going accounting issues, Defendants reported net income of $13.6 million, or $0.35 per diluted share, on revenue of approximately $489 million, compared to net income of $10.4 million, or $0.27 per diluted share, on revenue of $382 million for the same period in the prior year.  Defendants also reported a $3.9 million increase in accounts receivable and an $11.3 million increase in accounts payable.

157.    On July 30, 2015, during the second quarter ended June 30, 2015 ("2Q 2015") earnings call, defendant DiBlasi repeated *"our proven ability to smoothly integrate each acquired company, are large factors as to why our pipeline is at such a high level."*

158.    On August 3, 2015, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for 2Q 2015.  Defendants reported net income of $16.5 million, or $0.42 per diluted share, on revenue of $517.9 million, compared to net income of $14.8 million, or $0.38 per diluted share, on revenue of $460.2 million for the same period in the prior year, despite continued accounting issues.  Defendants also reported a $28 million increase in accounts receivable and a $5.5 million increase in accounts payable.

159.    On November 9, 2015, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015 ("3Q 2015").  For the quarter, Defendants reported net income of $5.8 million, or $0.15 per diluted share, on revenue of $497.2 million, compared to net income of $14.4 million, or $0.37 per diluted share, on revenue

of $498.1 million for the same period in the prior year. Defendants also reported a $3.3 million increase in accounts receivable and a $9.9 million decrease in accounts payable.

160.    On March 1, 2016, Defendants caused Roadrunner to file with the SEC its Annual Report on Form 10-K, announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K"). Omitting on-going accounting issues, for the quarter, Defendants reported net income of $12.1 million, or $0.32 per diluted share, on revenue of $491 million, compared to net income of $12.4 million, or $0.32 per diluted share, on revenue of $532.5 million for the same period in the prior year. For 2015, Defendants reported that net income was $48 million, or $1.23 per diluted share, on revenue of $2 billion, compared to net income of $52 million, or $1.32 per diluted share, on revenue of $1.9 billion for 2014. Defendants also reported a $14 million decrease in accounts receivable and a $15.7 million decrease in accounts payable for 2015.

161.    On May 10, 2016, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016. For the quarter, Defendants reported net income of $3.1 million, or $0.08 per diluted share, on revenue of $465.6 million, compared to net income of $13.6 million, or $0.35 per diluted share, on revenue of $489 million for the same period in the prior year. Defendants also reported a $3.4 million decrease in accounts receivable and a $7 million increase in accounts payable. The Company disclosed that there was "a risk that we may not be in compliance with our financial covenants as of the end of the second quarter."

162.    On August 8, 2016, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2016 ("2Q 2016"). Without mentioning any on-going accounting issues, Defendants reported that net income was $1.8 million,

or $0.05 per diluted share, on revenue of $483.43 million, compared to net income of $16.5 million, or $0.42 per diluted share, on revenue of $517.9 million for the same period in the prior year. Defendants also reported a $2.4 million increase in accounts receivable and a $14.5 million increase in accounts payable.

163.     Despite on-going red flags indicating accounting issues and a lack of internal controls over the Company's financial reporting, on November 14, 2016, Defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016.  For the quarter, Defendants reported net income of $7.9 million, or $0.21 per diluted share, on revenue of $532.2 million, compared to net income of $5.8 million, or $0.15 per diluted share, on revenue of $497.2 million for the same period in the prior year.  Defendants also reported a $39.6 million increase in accounts receivable and a $48.3 million increase in accounts payable.

164.     Furthermore, in numerous SEC filings during the Relevant Period, Defendants asserted that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting, including the quarterly reports and annual reports from 2011 through 2016, which were signed by defendants DiBlasi and Armbruster and included statements concerning the adequacy of the Company's internal controls over its financial reporting.  These public filings contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

**The False and Misleading 2015 Proxy**

165.     On April 7, 2015, defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup and Vijums caused Roadrunner to file with the SEC its 2015 Proxy in connection with the 2015 Annual Meeting of Stockholders, to be held on May 13, 2015.  In the 2015 Proxy, Defendants

solicited stockholder votes to, among other things, re-elect defendants Urkiel, Utrup and Vijums to the Board.

166.    Those defendants stated in the 2015 Proxy that the Board was committed to risk oversight, the Audit Committee exercised oversight of the Company's financial statements, and Roadrunner's financial statements were accurate and therefore the Board's approval of their inclusion in the Company's annual report was appropriate.  The 2015 Proxy also included a vote on the election of members of the Board, including defendants Urkiel, Utrup and Vijums.

167.    Defendants negligently issued materially misleading statements with respect to these solicited votes.  Defendants negligently issued materially misleading statements with respect to these solicited votes.

168.    In support of re-electing defendants Urkiel, Utrup and Vijums, the 2015 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) Roadrunner's financial statements were accurate, and therefore the Board's approval of their inclusion in the Company's annual report was appropriate.  The 2015 Proxy stated:

### Role of the Board of Directors in Risk Management and Oversight

While our management is primarily responsible for managing risk, ***our board of directors and each of its committees plays a role in overseeing our risk management practices.  The role of our board of directors in our company's risk oversight process includes receiving reports from members of senior management on areas of material risk to our company, including operational, financial, legal and regulatory, and strategic and reputational risks.  Our board of directors receives these reports from the appropriate executive within our organization to enable it to understand our risk identification, risk management, and risk mitigation strategies***.  This direct communication from management enables our board of directors to coordinate its risk oversight role, particularly with respect to risk interrelationships within our organization.  Our board of directors believes that its leadership structure has the effect of enhancing its risk oversight function because of the chairman's direct involvement in risk oversight matters and

his strong efforts to increase open communication regarding risk issues among directors and the committees of our board of directors. Our board of directors also believes that Mr. Rued's knowledge of our company's business, industry, and risks significantly contributes to our board of directors' understanding and appreciation of risk issues.

Our board of directors allocates responsibility for overseeing risk management for our company among the board and each of its committees. Specifically, the full board oversees significant risks primarily relating to operations, strategy, and finance. In addition, each of our committees considers risks within its area of responsibilities, as follows:

- ***Our audit committee is primarily responsible for overseeing matters involving major financial risk exposures and actions management is taking to monitor such risk exposures. This includes risks relating to financial reporting and internal controls; litigation; tax matters; liability insurance programs; and compliance with legal and regulatory requirements and our code of ethics. In addition, our audit committee reviews our quarterly and annual financial reports, including any disclosure in those reports of risk factors affecting our company and business***.

*     *     *

Through the activities of our audit, compensation, and nominating/corporate governance committees, as well as our board of directors' interactions with management concerning our business and the material risks that may impact our company, our board of directors is able to monitor our risk management process and offer critical insights to our management.

*     *     *

## REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

Our board of directors has appointed an audit committee consisting of three independent directors. All members of our audit committee are able to read and understand fundamental financial statements, including our balance sheet, income statement, and cash flow statement. All members of our audit committee have past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background which results in each individual's financial sophistication, including being or having been a chief executive officer, chief financial officer, or other senior officer with financial oversight responsibility. Our board of directors has determined that Messrs. Utrup, Kennedy, and Urkiel are independent directors, as defined by Section 303A of the NYSE Listed Company Manual, and that Mr. Utrup, chairman, qualifies as an "audit committee financial expert."

*The primary responsibility of our audit committee is to assist our board of directors in fulfilling its responsibility to oversee management's conduct of our financial reporting process, including overseeing the financial reports and other financial information provided by us to governmental or regulatory bodies (such as the SEC), the public, and other users thereof; our systems of internal accounting and financial controls; and the annual independent audit of our consolidated financial statements*.

*Management has the responsibility for our consolidated financial statements and the reporting process, including the systems of internal controls*. Our independent registered public accounting firm engaged to conduct the audit of our 2014 financial statements, Deloitte & Touche LLP, is responsible for auditing our consolidated financial statements and expressing an opinion on the conformity of those audited consolidated financial statements with generally accepted accounting principles.

*In fulfilling its oversight responsibilities, our audit committee reviewed and discussed our consolidated audited financial statements with management and the independent registered public accounting firm*. Our audit committee discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 16, Communication with Audit Committees. *This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with our audit committee under generally accepted auditing standards*. In addition, our audit committee received from the independent registered public accounting firm written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's independence. Our audit committee also discussed with the independent registered public accounting firm their independence from management and our company, including the matters covered by the written disclosures and letter provided by the independent registered public accounting firm. Our audit committee has concluded that Deloitte & Touche LLP is independent from our company and management.

Our audit committee discussed with the independent registered public accounting firm the overall scope and plans for their audits. Our audit committee met with the independent registered public accounting firm, with and without management present, to discuss the results of their examinations, their evaluations of our company, the internal controls, and the overall quality of our financial reporting. Our audit committee held nine meetings during the fiscal year ended December 31, 2014.

Based on the reviews and discussions referred to above, our audit committee recommended to our board of directors, and our board of directors approved, that our audited consolidated financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2014 for filing with the SEC.

Our board of directors has adopted a written charter for our audit committee that reflects, among other things, requirements of the Sarbanes-Oxley Act of 2002, rules adopted by the SEC, and rules of the NYSE.

This report has been furnished by our audit committee to our board of directors.

169. Defendants' statements misleadingly stated that the Board: (i) maintained sufficient compliance, internal control, review and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices. The 2015 Proxy omitted any disclosures that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in 2011 overstated the Company's estimated results of operations and net income; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and line haul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company had failed to adequately integrate the numerous acquisitions.

170. The 2015 Proxy was false and misleading because the Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements. Most importantly, the Company was not correctly accounting for its revenues and earnings, and therefore, its financial statements were not appropriate to include in the Company's annual report. Defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup and Vijums were negligent in making these materially misleading statements in the 2015 Proxy.

171. The 2015 Proxy harmed Roadrunner by infringing upon proper governance associated with the integrity of corporate suffrage which follows from the free and informed exercise of the stockholders' right to vote for directors. As a result of Defendants' misleading

statements in the 2015 Proxy, Roadrunner's stockholders voted via an uninformed shareholder vote to re-elect defendants Urkiel, Utrup and Vijums to Roadrunner's Board.

***The False and Misleading 2016 Proxy***

172.     On April 6, 2016, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward caused Roadrunner to file with the SEC its 2016 Proxy in connection with the 2016 Annual Meeting of Stockholders, to be held on May 18, 2016 (the "2016 Proxy").  Those members of the Board stated in the 2016 Proxy that they were committed to risk oversight, the Audit Committee exercised oversight of the Company's financial statements, and Roadrunner's financial statements were accurate and therefore the Board's approval of their inclusion in the Company's annual report was appropriate.  In the 2016 Proxy, Defendants solicited stockholder votes to, among other things, re-elect defendants DiBlasi, Kennedy and Rued to the Board.

173.     Defendants negligently issued materially misleading statements with respect to these solicited votes.  Plaintiffs disclaim any claim of fraud or knowing wrongdoing in connection with the misleading statements in the 2016 Proxy.

174.     In support of re-electing defendants DiBlasi, Kennedy and Rued, the 2016 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) Roadrunner's financial statements were accurate, and therefore the Board's approval of their inclusion in the Company's annual report was appropriate.  The 2016 Proxy stated:

**Role of the Board of Directors in Risk Management and Oversight**

While our management is primarily responsible for managing risk, ***our board of directors and each of its committees plays a role in overseeing our risk management practices.  The role of our board of directors in our company's risk***

*oversight process includes receiving reports from members of senior management on areas of material risk to our company, including operational, financial, legal and regulatory, and strategic and reputational risks. Our board of directors receives these reports from the appropriate executive within our organization to enable it to understand our risk identification, risk management, and risk mitigation strategies. This direct communication from management enables our board of directors to coordinate its risk oversight role, particularly with respect to risk interrelationships within our organization*. Our board of directors believes that its leadership structure has the effect of enhancing its risk oversight function because of the chairman's direct involvement in risk oversight matters and his strong efforts to increase open communication regarding risk issues among directors and the committees of our board of directors. Our board of directors also believes that Mr. Rued's knowledge of our company's business, industry, and risks significantly contributes to our board of directors' understanding and appreciation of risk issues.

Our board of directors allocates responsibility for overseeing risk management for our company among the board and each of its committees. Specifically, the full board oversees significant risks primarily relating to operations, strategy, and finance. In addition, each of our committees considers risks within its area of responsibilities, as follows:

- *Our audit committee is primarily responsible for overseeing matters involving major financial risk exposures and actions management is taking to monitor such risk exposures. This includes risks relating to financial reporting and internal controls; litigation; tax matters; liability insurance programs; and compliance with legal and regulatory requirements and our code of ethics. In addition, our audit committee reviews our quarterly and annual financial reports, including any disclosure in those reports of risk factors affecting our company and business*.

\*　　\*　　\*

Through the activities of our audit, compensation, and nominating/corporate governance committees, as well as our board of directors' interactions with management concerning our business and the material risks that may impact our company, our board of directors is able to monitor our risk management process and offer critical insights to our management.

\*　　\*　　\*

## REPORT OF THE AUDIT COMMITTEE OF
## THE BOARD OF DIRECTORS

Our board of directors has appointed an audit committee consisting of three independent directors. All members of our audit committee are able to read and

understand fundamental financial statements, including our balance sheet, income statement, and cash flow statement. All members of our audit committee have past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background which results in each individual's financial sophistication, including being or having been a chief executive officer, chief financial officer, or other senior officer with financial oversight responsibility. Our board of directors has determined that Messrs. Murray, Kennedy, and Urkiel are independent directors, as defined by Section 303A of the NYSE Listed Company Manual, and that Mr. Murray, chairman, qualifies as an "audit committee financial expert."

*The primary responsibility of our audit committee is to assist our board of directors in fulfilling its responsibility to oversee management's conduct of our financial reporting process, including overseeing the financial reports and other financial information provided by us to governmental or regulatory bodies (such as the SEC), the public, and other users thereof; our systems of internal accounting and financial controls; and the annual independent audit of our consolidated financial statements.*

*Management has the responsibility for our consolidated financial statements and the reporting process, including the systems of internal controls.* Our independent registered public accounting firm engaged to conduct the audit of our 2015 financial statements, Deloitte & Touche LLP, is responsible for auditing our consolidated financial statements and expressing an opinion on the conformity of those audited consolidated financial statements with generally accepted accounting principles.

*In fulfilling its oversight responsibilities, our audit committee reviewed and discussed our consolidated audited financial statements with management and the independent registered public accounting firm.* Our audit committee discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 16, Communication with Audit Committees. *This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with our audit committee under generally accepted auditing standards.* In addition, our audit committee received from the independent registered public accounting firm written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's independence. Our audit committee also discussed with the independent registered public accounting firm their independence from management and our company, including the matters covered by the written disclosures and letter provided by the independent registered public accounting firm. Our audit committee has concluded that Deloitte & Touche LLP is independent from our company and management.

Our audit committee discussed with the independent registered public accounting firm the overall scope and plans for their audits. Our audit committee met with the independent registered public accounting firm, with and without management present, to discuss the results of their examinations, their evaluations of our company, the internal controls, and the overall quality of our financial reporting. Our audit committee held nine meetings during the fiscal year ended December 31, 2015.

Based on the reviews and discussions referred to above, our audit committee recommended to our board of directors, and our board of directors approved, that our audited consolidated financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2015 for filing with the SEC.

Our board of directors has adopted a written charter for our audit committee that reflects, among other things, requirements of the Sarbanes-Oxley Act of 2002, rules adopted by the SEC, and rules of the NYSE.

This report has been furnished by our audit committee to our board of directors.

175. Defendants' statements misleadingly state that the Board: (i) maintained sufficient compliance, internal control, review and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices. The 2016 Proxy omitted any disclosures that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in 2011 overstated the Company's estimated results of operations and net income; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and line haul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company had failed to adequately integrate its numerous acquisitions.

176. The 2016 Proxy was false and misleading because the Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements. Most importantly, the Company was not correctly accounting for its revenues

and earnings, and therefore, its financial statements were not appropriate to include in the Company's annual report. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward were negligent in making these materially misleading statements in the 2016 Proxy.

177. The 2016 Proxy harmed Roadrunner by infringing upon proper governance associated with the integrity of corporate suffrage which follows from the free and informed exercise of the stockholders' right to vote for directors. As a result of Defendants' misleading statements in the 2016 Proxy, Roadrunner's stockholders voted via an uninformed shareholder vote to re-elect defendants DiBlasi, Kennedy and Rued to Roadrunner's Board.

**Defendants Failed to Hold an Annual Meeting of Stockholders in Violation of the Company's By-Laws and Delaware Law**

178. Under Article 1, Section 1.2 of the Company's Second Amended and Restated By-Laws ("By-Laws"), titled "Annual Meetings," the Board is required to designate a time for "annual meetings of stockholders." Further, §211 requires that an annual stockholders meeting be held within 13 months of the previous meeting.

179. In the aftermath of Roadrunner's revelations regarding its accounting issues, the Company has not provided notice to stockholders of any impending annual meeting or Board election. On March 17, 2017, the Company filed a Notification of Late Filing on Form 12b-25 with SEC, providing notice that the Company would not be filing its Annual Report on Form 10-K on time. Also, the Company has yet to file a 2017 Proxy Statement with the SEC announcing its annual meeting.

180. Most importantly, to date, the Company still has not held its Annual Meeting of Stockholders for 2017. In fact, the last time the Company held its Annual Meeting of Stockholders was on May 18, 2016, more than 22 months ago. Thus, Roadrunner is in violation of its By-Laws

and Delaware law, wrongfully denying the Company's stockholders their important right to voice their frustration at an annual meeting or by withholding their votes for the directors that have breached their fiduciary duties.

181.    This failure to hold an Annual Meeting of Stockholders is particularly egregious here given the misleading 2015 Proxy and 2016 Proxy (collectively, the "Proxies") and the additional appointments to the Board.

***Defendants Violated §8 of the Clayton Act by Appointing Defendant Dobak to the Roadrunner Board***

182.    Roadrunner's newly appointed director, defendant Dobak, is an interlocking director within the meaning of §8 of the Clayton Act.  On June 6, 2017, the Board appointed defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the position of Director on the Board without an election of the stockholders.

183.    Upon information and belief, Roadrunner and the privately traded Dicom each have a combined capital, surplus and undivided profit exceeding $32,914,000.  Both are engaged in commerce.  The two companies compete with one another, providing, among other things, transportation logistics, full truckload and LTL services, and TMS in the United States.

184.    Roadrunner provides transportation services through a suite of global supply chain solutions, including TL, customized and expedited LTL, intermodal solutions, freight consolidation, inventory management, expedited services, air freight, international freight forwarding, customs brokerage and TMS, primarily in the United States.  The Company splits its operations into three segments: TL, LTL and Global Solutions.  According to the Company's most recent Annual Report on Form 10-K filed with the SEC on March 1, 2016, the Company reported total revenues for fiscal year 2015 of nearly $2 billion.  TL accounted for 58.9% of the Company's revenues at approximately $1.2 billion.  The next largest segment at 25.9% of revenues, LTL,

accounted for $516 million of the Company's total revenue. Global Solutions provided an additional $330 million, or 16.6%, of total revenues.

185. Dicom also provides transportation services that overlap with the services provided by Roadrunner. Dicom engages in commerce and provides full TL, LTL and TMS services throughout North America, including in the United States. Upon information and belief, Dicom has capital, surplus and undivided profits exceeding $32,914,000.

186. Further, upon information and belief, Roadrunner's and Dicom's competitive annual sales exceed §8's exemptions. Roadrunner's and Dicom's competitive annual sales: (i) exceed $3,291,400; (ii) are more than 2% of total sales for either corporation; and (iii) are more than 4% of total sales for each corporation.

187. The Board breached its fiduciary duty to the Company by causing it to break the law.

## INSIDER TRADING ALLEGATIONS

188. During the Relevant Period, while Roadrunner stock was artificially inflated due to defendants' breaches of fiduciary duties, certain Defendants sold nearly all of their personally held Roadrunner shares, reaping over $184 million in insider trading proceeds. Defendants' illegal insider trading was suspicious in both timing and amount.

189. The sales were suspicious in timing because many of the sales occurred near the height of Roadrunner's artificially inflated stock price. The sales were also suspicious in amount. Each of the defendants (described below) who engaged in insider trading sold from 40% to 93% of their holdings. Defendants' insider sales are as follows:

(a) Between May 2013 and August 2015, defendant Rued reported selling 6.445 million shares for over $159.2 million in illicit insider trading proceeds. These sales amounted to approximately 45% of Rued's holdings. Moreover, Rued's insider trading alone

demonstrates that he is interested in the outcome of this litigation by personally benefitting from his breach of fiduciary duty, rendering any demand upon him futile.

(b)     Between May 2013 and March 2014, defendant DiBlasi sold 179,177 shares for illegal insider trading proceeds of over $4.6 million. These sales amounted to approximately 40% of DiBlasi's holdings. Moreover, DiBlasi's insider trading alone demonstrates that he is interested in the outcome of this litigation by personally benefitting from his breach of fiduciary duty, rendering any demand upon him futile.

(c)     Between May 2013 and November 2013, defendant Dobak sold 47,424 shares for illegal insider trading proceeds of over $1.2 million. These sales amounted to approximately 93% of Dobak's holdings.

(d)     Between May 2013 and February 2015, defendant Armbruster sold 189,852 shares for illegal insider trading proceeds of over $5 million. These sales amounted to approximately 76% of Armbruster's holdings.

(e)     Between May 2013 and February 2015, defendant van Helden sold 103,234 shares for illegal insider trading proceeds of over $2.7 million. These sales amounted to approximately 51% of van Helden's holdings.

## DAMAGES TO ROADRUNNER

190.     As a result of Defendants' improprieties, Roadrunner disseminated improper public statements concerning the adequacy of the Company's internal controls over its financial reporting and its growth-through-acquisition corporate strategy. These improper statements have devastated Roadrunner's credibility, corporate image and goodwill as reflected by the Company's plummeting share price and significant market capitalization loss.

191.     Defendants' unlawful course of conduct has also subjected the Company to potentially hundreds of millions of dollars in damages in connection with the Securities Class

Actions lawsuits filed in the U.S. District Court for the Eastern District of Wisconsin. The Securities Class Actions allege that the Company and certain individual defendants violated securities laws by repeatedly misrepresenting that the Company had effective internal control over its financial reporting and disclosure procedures, when in fact the Company's financial statements could not be relied upon.

192.    The Company also announced that it was contacted by the SEC and the DOJ, and that the DOJ and Division of Enforcement of the SEC have commenced investigations into the events giving rise to the restatement. The Company has received formal requests for documents and other information.

193.    Roadrunner's disclosure issues also damaged its reputation within the business community and in the capital markets. In addition to price, Roadrunner's current and potential customers consider a company's trustworthiness, stability and ability to accurately describe its business operations. For at least the foreseeable future, Roadrunner will suffer from what is known as the "liar's discount," a term applied to the stocks of companies which have been implicated in improper behavior and have misled the investing public, such that Roadrunner's ability to raise equity capital or debt on favorable terms in the future is now impaired. Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial conditions. In the wake of the revelation that the Company miscalculated its cash flow leverage ratio due to accounting errors, Roadrunner's ability to raise equity capital or debt on favorable terms in the future is also now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated

by Defendants have materially increased the perceived risks of investing in and lending money to the Company.

194. Further, as a direct and proximate result of Defendants' actions, Roadrunner has expended, and will continue to expend, significant sums of money. As the Company disclosed in its 10-K/A filed on January 31, 2018:

> [the Company has] incurred significant expense, including audit, legal, consulting, and other professional fees, as well as fees related to amendments to our sixth amended and restated credit agreement, in connection with the restatement of our previously issued consolidated financial statements and the ongoing remediation of material weaknesses in our internal control over financial reporting.

195. Such expenditures include, but are not limited to:

    (a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

    (b)    costs incurred to investigate wrongdoing, including the internal investigation and the ongoing DOJ and SEC investigations; and

    (c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Roadrunner.

196. The Company also announced in the 10-K/A filed with the SEC on January 31, 2018 that it could be subject to delisting by the NYSE. Specially, the Company received notice from the NYSE informing it that the it was not in compliance with the NYSE's continued listing requirements under the timely filing criteria set forth in Section 802.01E of the NYSE Listed Company Manual and that they were subject to the procedures set forth in the NYSE's listing standards related to late filings. After a series of previous extensions, on December 18, 2017, the NYSE granted Roadrunner an extension to April 4, 2018 to file its delinquent 2016 Annual Report on Form 10-K and the required 2017 Quarterly Reports on Form 10-Q. Roadrunner has not filed

its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and

September 30, 2017 and as such, the Company remains subject to the procedures set forth in the

NYSE's listing standards related to late filings and subject to the risk of delisting.

## DERIVATIVE ALLEGATIONS

197.    Plaintiffs incorporate ¶¶1-196.

198.    Plaintiffs bring this action derivatively in the right and for the benefit of Roadrunner

to redress injuries suffered, and to be suffered, by Roadrunner as a direct result of violations of the

federal securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment,

as well as the aiding and abetting thereof by Defendants.  Roadrunner is named as a nominal

defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on

this Court that it would not otherwise have.

199.    Plaintiffs will adequately and fairly represent the interests of Roadrunner in

enforcing and prosecuting its rights.

200.    Plaintiffs were stockholders of Roadrunner at the time of the wrongdoing

complained of, have continuously been a stockholder since that time, and are current Roadrunner

stockholders.

201.    The Board consists of the following 12 individuals: defendants DiBlasi, Dobak,

Doerr, Kennedy, Kittle, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward.  Plaintiffs have

not made any demand on the Board to institute this action because such a demand would be a

futile, wasteful and useless act, as set forth below.

202.    Any suit by the directors of Roadrunner to remedy the wrongs complained of herein

would expose defendants themselves and their friends and business allies to significant personal

liability for their breach of fiduciary duties and other misconduct. Defendants DiBlasi, Doerr,

Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward have demonstrated their

unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the wrongful conduct described herein. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward are accused of wrongdoing and recommending, approving and ratifying the materially false and misleading statements identified herein and, thus, face a substantial likelihood of liability, thereby rendering any demand upon them futile.

203.    The entire Board had a duty during the Relevant Period to make sure that the Company's governance structure and processes were sufficient to detect, prevent, and misconduct and willful disregard of internal controls.  By their sustained and systematic failure to exercise oversight of the pervasive internal control issues and integration problems during the Relevant Period, and enabling, encouraging, condoning, and ignoring the red flags of risk related to the schemes, the Board abandoned its fiduciary duties before and during the Relevant Period.  In addition, defendants Kennedy, Murray, Urkiel and Utrup were aware of wrongdoing by virtue of their positions as members of the Audit Committee, because information concerning the wrongdoing and the Company's issues with integration of the acquired companies would have been shared at the board meetings.  These defendants knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith.

204.    Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the effectiveness of the Company's internal controls over its financial reporting.  Specifically, in public filings with the SEC during the Relevant Period, the Board averred to the public that the Company's growth-through-acquisition

strategy had a positive effect on its revenues and that the strategy had a material impact on the Company's overall growth. The Board also claimed that there were no material changes to its internal control over financial reporting or disclosures. This despite the fact that the financial statements during this years-long scheme overstated the estimated results of operations; contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and linehaul and other driver payables; and the Company was engaged in improper accounting practices and had no integration plans. As a result, the Company had to acknowledge that the financial information contained in its public filings during the Relevant Period could not be relied upon.

205. Further, while acting in their capacities as members of the Company's Board and Board committees, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward knew of or recklessly permitted the illegal practices described above, approved lucrative compensation packages to senior management and refused to take action or clawback such compensation, concealed the conduct from regulators and investors, and failed to implement any meaningful changes to end the illegal practices, even after specific warnings were brought to their attention.

206. Defendants Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward's failure to meet their fiduciary obligations also allowed defendants Rued, DiBlasi, Dobak and Armbruster to reap millions in illegal gains from selling Roadrunner shares at artificially inflated prices.

207. Defendants Rued, DiBlasi and Dobak are interested because they realized unlawful insider selling proceeds from their misuse of inside Company information during the Relevant Time Period. These defendants used the artificially inflated stock prices caused by Defendants'

false or misleading statements regarding the Company's financial "success" to sell stock. Such defendants, as alleged in detail *supra*, sold or otherwise disposed of millions of dollars' worth of Roadrunner stock during the Relevant Time Period, all while in possession of, and on the basis of, material, non-public information.

208. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward are responsible for the negligently made statements in the materially misleading Proxies. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, an indemnification provided by the Company to defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward does not protect them for violations of section 14(a) in the Proxies. Accordingly, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward face a substantial likelihood of liability, excusing a demand.

209. In fact, the Proxies specifically stated that the Audit Committee reviewed the Company's financial statements and recommended their approval for inclusion in Roadrunner's annual reports. The Proxies also stated that the Board approved the inclusion of the incorrect financial statements in the Company's annual reports. In particular, on behalf of defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward, the Proxies substantiated that the Audit Committee had reviewed the Company's audited financial statements for fiscal years 2014 and 2015 and recommended to the Board, and the Board approved, the inclusion of the audited financial statements in the Company's Annual Reports on Form 10-K for the fiscal years ended December 31, 2014 and 2015, for filing with the SEC.

210. Demand is also excused because defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward selected the law firm of Greenberg Trauig LLP

to assist with the Audit Committee's investigation and entrusted its investigation to conflicted counsel, even though the firm had material conflicts as it has represented the alleged wrongdoers in proceedings related to the very subject matter that the law firm was asked to neutrally investigate, which is incompatible with a board's fiduciary duty to inform itself of all material information reasonably available prior to making a business decision.

211. Moreover, demand is excused because a majority of the directors, ten out of the current expanded twelve directors, committed the *ultra vires* act of appointing the interlocking director defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the Board without a stockholder vote. As stated above, this act violates §8. These ten directors are: defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward. As a result, a majority of the current Roadrunner Board faces a substantial likelihood of liability under §8. Furthermore, defendant Dobak is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his position on the Board. Demand on these current Board members is therefore excused.

212. Further, the Compensation Committee of the Board, consisting of defendants Doerr, Staley and Urkiel, is responsible for approving Roadrunner's executive officers' compensation, including that of defendant DiBlasi. In 2014 and 2015, defendant DiBlasi received $1,037,316 and $1,214,173, respectively, in total compensation based on his employment as an executive of Roadrunner. As the members of the Compensation Committee singularly control approval of defendant DiBlasi's compensation, DiBlasi will not institute this action against defendants Doerr, Staley and Urkiel. To do so would jeopardize his personal financial compensation. Thus, demand on defendant DiBlasi is futile.

213.    According to the Company's Compensation Committee Charter, the Compensation Committee shall "[e]stablish and review the overall compensation philosophy of the Company" and "[r]eview and recommend to the full Board of Directors compensation of directors as well as directors' and officers' indemnification and insurance matters."    Moreover, Roadrunner's Compensation Committee shall "[r]eview and approve the Company's corporate goals and objectives relevant to the compensation for the CEO and other executive officers, including annual performance objectives" and "make recommendations to the Board of Directors with respect to, or, as directed by the Board of Directors, determine and approve, compensation, incentive-compensation plans, and equity-based plans for all other executive officers of the Company." Thus, because each director defendant approves each other director defendant's cash compensation, each director defendant would not institute this action against the other director defendants, as it would jeopardize their personal compensation.  Thus, demand on each of Doerr, Staley and Urkiel is futile.

214.    Defendants Kennedy, Murray, Urkiel and Utrup, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  Defendants Kennedy, Murray and Urkiel are held to higher standards of financial expertise.  The Audit Committee's Charter provides that the members must oversee "the accounting and financial reporting processes of the Company and audits of the financial statements of the Company." Moreover the Audit Committee's Charter provides that it is responsible for providing assistance to the Board with respect to its oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications and independence of the Company's independent auditor, and the performance of the Company's internal audit function and independent auditor.  Furthermore, the Audit Committee is required to

report to the Board any major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies. Thus, defendants Kennedy, Murray, Urkiel and Utrup were responsible for knowingly or recklessly allowing the improper statements related to the Company's financial reporting. Despite their knowledge or reckless disregard, defendants Kennedy, Murray, Urkiel and Utrup caused these improper statements. Accordingly, these defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Kennedy, Murray, Urkiel and Utrup face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

215. The principal professional occupation of defendants DiBlasi, Stoelting and Vijums is their employment with Roadrunner, pursuant to which they have received and continue to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendants DiBlasi, Stoelting and Vijums lack independence from defendants Rued, Staley, Doerr, Kennedy, Murray, Urkiel and Ward due to their interest in maintaining their executive positions at Roadrunner. This lack of independence renders defendants DiBlasi, Stoelting and Vijums incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation. Demand is futile as to defendants Stoelting, DiBlasi and Vijums.

216. Defendants Rued and Vijums are also employees of HCI. Defendant Rued is the co-founder and a managing partner at HCI, and defendant Vijums is a managing director at HCI. As Defendants admit in Roadrunner's Proxy Statements from 2013 to 2016, defendants Rued and Vijums are not considered independent directors as a result of their relationships with HCI, which

is affiliated with investment funds that hold a large amount of Roadrunner stock. Defendants further admit in Proxy Statements from 2013 to 2016 that Roadrunner paid HCI fees and remunerations for services performed in conjunction with acquisitions and debt financing in accordance with advisory agreements. Accordingly, defendants Rued and Vijums lack independence from defendants DiBlasi, Staley, Stoelting, Doerr, Kennedy, Murray, Urkiel and Ward due to their direct and indirect pecuniary interest in Roadrunner through their employment with HCI. This lack of independence renders defendants Rued and Vijums incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation. Demand is futile as to defendants Rued and Vijums.

217. Plaintiffs have not made any demand on the other stockholders of Roadrunner to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Roadrunner is a publicly held company with over 38.3 million shares outstanding and thousands of stockholders as of November 11, 2016;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### For Violations of Section 14(a) of the Exchange Act
### Against Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley,
### Stoelting, Urkiel, Utrup, Vijums and Ward

218. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

219. Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

220. The Proxies violated section 14(a) and Rule 14a-9 because they solicited Roadrunner shareholder votes for, *inter alia*, director re-election and executive compensation, while simultaneously misrepresenting and/or failing to disclose that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first quarter of 2014 overstated the Company's estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and linehaul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company had failed to integrate its numerous acquisitions. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums and Ward issued, caused to be issued, and participated in the issuance of these materially false and misleading written statements to stockholders in the Proxies. By reasons of the conduct alleged herein, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums and Ward violated section 14(a) of the Exchange Act. As a direct

and proximate result of these violations, stockholders voted in favor of re-electing defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup and Vijums to the Board. Defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup and Vijums' re-election led to the continuation of the wrongful practices described herein.

221. In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading. In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading, and/or that the Proxies omitted material information. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxies.

222. Plaintiffs, on behalf of Roadrunner, thereby seek relief for damages inflicted upon the Company in connection with the improper election of defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup and Vijums based upon the false and misleading Proxies, and also seek new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### For Breach of Fiduciary Duty Against All Defendants

223. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

224. Defendants owed and owe Roadrunner fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe Roadrunner the highest obligation of good faith, fair dealing, loyalty and due care.

225. Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith and loyalty. More specifically, defendants violated their duty of good faith by

creating a culture of lawlessness within Roadrunner and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

226. Defendants knew, or were reckless or grossly negligent in disregarding, the illegal activity of such substantial magnitude and duration. Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first quarter of 2014 overstated the Company's estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables; and (iv) the Company had failed to integrate its numerous acquisitions. Accordingly, Defendants breached their duty of care and loyalty to the Company.

227. Defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums and Ward, as directors of the Company, owed Roadrunner the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper statements. Defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums and Ward knew or were reckless in not knowing that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements overstated the Company's estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables; and (iv) the Company failed to integrate its acquisitions. Accordingly, defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums and Ward breached their duty of loyalty to the Company.

228.     Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward breached their fiduciary duty and committed the *ultra vires* act of appointing the interlocking defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the Board.  As stated above, defendant Dobak's service on the Board violates §8.

229.     Defendants Kennedy, Murray, Urkiel and Utrup, as members of the Audit Committee, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  These defendants completely and utterly failed in their duty of oversight, and defendants Kennedy, Murray, Urkiel and Utrup failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

230.     As a direct and proximate result of Defendants' breach of their fiduciary obligations, Roadrunner has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these Defendants are liable to the Company.

231.     Plaintiffs, on behalf of Roadrunner, have no adequate remedy at law.

## COUNT III

### For Waste of Corporate Assets Against All Defendants

232.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

233.     As a result of Defendants' reckless growth-through-acquisition strategy, the Company spent hundreds of millions of dollars purchasing various companies to prop up Roadrunner's reported revenues and earnings.  In the course of this strategy, the Company failed to implement adequate integration procedures.  As a direct result of these reckless purchases,

Roadrunner was forced to announce that its financial reporting filed with the SEC during the Relevant Period could not be relied upon.

234.     As a result of Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Roadrunner is subject to numerous securities fraud class action lawsuits.  Defendants have caused Roadrunner to waste its assets by forcing it to defend itself in the ongoing litigation.  In addition, Roadrunner faces potential liability for any costs from a potential settlement or adverse judgment in the litigation.

235.     In addition, Defendants have caused Roadrunner to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors in breach of their fiduciary duty.

236.     As a result of the waste of corporate assets, Defendants are liable to the Company.

237.     Plaintiffs, on behalf of Roadrunner, have no adequate remedy at law.

## COUNT IV

**For Unjust Enrichment Against Defendants Stoelting, DiBlasi, Staley, Doerr, Kennedy, Murray, Urkiel, Ward, Utrup, Armbruster and van Helden**

238.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

239.     By their wrongful acts and omissions, the defendants named in this Count were unjustly enriched at the expense of and to the detriment of Roadrunner.  These defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Roadrunner.

240.     Plaintiffs, as stockholders and representatives of Roadrunner, seek restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits

and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

241.    Plaintiffs, on behalf of Roadrunner, have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Roadrunner, demand judgment as follows:

A.    Awarding monetary damages against all Defendants, jointly and severally, for all damages and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B.    Directing Roadrunner to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Directing all Defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all fees, salaries, performance-based compensation, benefits and insider sales proceeds, and imposing a constructive trust thereon;

D.    Awarding punitive damages;

E.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 28, 2018

**KERKMAN WAGNER & DUNN**
SCOTT WAGNER

_/s/Electronically signed by K. Scott Wagner_
SCOTT WAGNER
839 N. Jefferson Street, Suite 400A
Milwaukee, WI  53202
Telephone:  414/277-8200
414/254-7526 (fax)

**ROBBINS GELLER RUDMAN**
 **& DOWD LLP**
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

**ROBBINS ARROYO LLP**
BRIAN J. ROBBINS
STEPHEN J. ODDO
NICHOLE T. BROWNING
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)

_Attorneys for Plaintiffs_

<u>VERIFICATION</u>

I, Jesse Kent, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Consolidated Shareholder Derivative Complaint for Violation of Federal Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 3-20-18

JESSE KENT

**VERIFICATION**

I, Michelle Kichline, as Chair of the Chester County Employees Retirement Fund ("Chester County"), acting on behalf of and with the consent of the Chester County Board of Trustees, hereby verify that I am familiar with the allegations in the Verified Consolidated Shareholder Derivative Complaint for Violation of Federal Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment and that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Chester County Employees Retirement Fund

DATED: 3/20/18

_Michelle Kichline_

Michelle Kichline, Chair

1394369_1